[No. D017900. Fourth Dist., Div. One. May 19, 1995.]

DONALD L. BUEHLER, Plaintiff and Appellant, v.
ROBERT SBARDELLATI, Defendant and Respondent.

## COUNSEL

Mazzarella, Dunwoody, Wilson & Petty, Mark C. Mazzarella and Joe B. Stansell for Plaintiff and Appellant.

Butz, Lucas, Dunn & Enright, Douglas M. Butz and Kevin V. DeSantis for Defendant and Respondent.

## OPINION

NARES, J.—In this legal malpractice action, Donald L. Buehler, M.D., appeals a judgment entered in favor of Attorney Robert Sbardellati after a jury returned a special verdict finding Sbardellati was not negligent. The gist of Buehler's action was that Sbardellati breached his professional responsibilities as an attorney while performing certain services in connection with a 1985 Texas real estate investment involving a limited partnership in which Buehler was to be a limited partner and James Parrish was the general partner; where both Buehler and Parrish for years had been clients of Sbardellati and his law firm, Harrigan, Ruff, Ryder & Sbardellati (HRRS); and Sbardellati possessed information about the particular real property involved as well as Parrish's past dealings with it.

Buehler asserts (1) error in instructions that (a) a finding of negligence against an attorney required a conflict of interest on the attorney's part, and (b) a conflict does not exist where two clients pursue a common goal; (2) abuse of discretion in the trial court's precluding him from arguing evidence that would have established that Sbardellati's clients had conflicting interests; (3) an absence of substantial evidence supporting the special verdict Sbardellati did not commit any negligence; and (4) error in the trial court's ruling that a cause of action for breach of fiduciary duty does not exist separate and apart from a cause of action for negligence. We conclude there is no ground for reversal in the contentions.

FACTS[1]

*The Loss*

Buehler initially invested $100,000 as a limited partner in the limited partnership known as BD Ltd. which bought a Texas apartment complex

---

[1]We state the facts in accord with the rule we "must consider the evidence in the light *most favorable to the prevailing party*, giving him the benefit of *every reasonable inference*, and *resolving conflicts* in support of the judgment." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289, original italics.)

called the Cloverleaf Apartments for $767,000, after Buehler had independently investigated the proposal and found out, among other things, the then existing lender had appraised the property at nearly twice that figure. Before the transaction closed in October 1985, Buehler had signed a loan guarantee and an agreement to add funds to BD Ltd. under certain circumstances, so-called paragraph 5.03 of the limited partnership agreement. In the next few years, Buehler added funds and was sued on the guarantee, with resultant total loss in excess of $700,000.

*Buehler, Parrish and HRRS*

Buehler, a cardiac surgeon, began using the HRRS law firm in late 1976 or early 1977 when he formed a medical corporation. Over the years until 1989 Buehler used HRRS exclusively for his medical business and family or investment matters. In 1978, Buehler met the firm's real estate and corporate lawyer, Sbardellati, who provided legal services in connection with a home purchase. Before entering into the BD Ltd. investment-limited partnership transaction in 1985, Buehler had entered eight other investment transactions with no or minimal legal advice from HRRS.[2]

At a meeting held at the HRRS offices in December 1984 to discuss an investment in real estate, Buehler was introduced to Parrish, an HRRS client since 1981. Buehler was told that Parrish had done well in Texas real estate. The group discussed a particular investment and decided it was not attractive.

*Formation of BD Ltd.*

From time to time in the first six months of 1985, Buehler and Parrish discussed other real estate investment possibilities. In June 1985, Parrish told Buehler about the Cloverleaf Apartments complex near Dallas, disclosing the apartments had been owned by a partnership of which Parrish was the general partner, and the partnership recently had repossessed it when the owner defaulted on the note. Parrish said he had purchased the apartment in 1977 for $600,000, rehabilitated it, and sold it in 1981 for $1.1 million.

---

[2]Buehler testified that on more than six different occasions between 1976 and 1985, without asking for legal advice from HRRS (a firm he had used for legal services on several other occasions), he made substantial investments in such things as storage facilities, real estate, and oil and gas tax shelters, each involving his signing legal documents including subscription agreements, a special power of attorney, investment and investor's notes, and an investment security agreement. Several of the investments involved a high degree of risk. His interest in most of these investments was that of a limited partner.

On two additional investments of a similar type, Buehler asked HRRS to make one telephone call and to look at the partnership offering.

Parrish told Buehler he thought it could be purchased out of foreclosure for between $700,000 and $800,000. Buehler thought this was a decent purchase price and told Parrish he was interested if Parrish could buy it.

In July 1985, Buehler and Parrish discussed financing the purchase of the Cloverleaf Apartments complex. Buehler made a detailed investment and tax analysis of the proposal, and he hired a Texas real estate investment expert and building contractor to check out the financial and rehabilitation aspects of the property. The real estate expert told Buehler he thought it was a good deal. Buehler also received a report there was a crack in the foundation of the 18-year-old property and there was a bad soil condition.

Buehler decided to go ahead with the transaction, at one time stating in what he described as a tongue-in-cheek manner, "the idea going in was to buy this property at a low price, to fix it up, to increase the occupancy [and] rental rate . . . , and then to sell it at a profit and live off [the proceeds as] retirement."

Early on in his discussions of the transaction with Parrish, Buehler received from Parrish and went over a draft of a limited partnership agreement. It was decided that Parrish would act as general partner and assume responsibility for the day-to-day operation and monitoring of the complex. Buehler and Parrish's nephew, Don Davis, would be limited partners, contributing $100,000 and $50,000 respectively, and Parrish would contribute $100,000. The parties also agreed upon compensation and reimbursement of the general partner Parrish.

During this time the $767,000 purchase price was agreed upon, and financing was arranged with Texas lender Sunbelt Savings & Loan. Parrish sent Buehler a contract for the purchase of real property, which Buehler signed without designating himself as a limited partner. Also, in early August 1985, Buehler personally inspected the Texas property for one to two hours, meeting the on-site manager and reviewing the available documents, including income and expense rolls.

All of the above activities with respect to the Cloverleaf Apartments complex limited partnership investment were done without consultation with HRRS. Buehler and Parrish had agreed on the terms of the transaction before they contacted Sbardellati.

*Sbardellati's Participation as Attorney*

On August 12, 1985, Sbardellati received paperwork on the transaction, including the contract of sale signed by both Buehler and Parrish bearing a

closing date of September 20. On August 26, Buehler told Sbardellati he and Parrish had agreed to the price and the real estate; he had some concerns about the structure of the partnership with respect to the general partner's duties and responsibilities. According to Parrish, he and Buehler told Sbardellati, "We don't want you to make any decisions regarding the partnership agreement, or anything like that. We just want you to make sure this agreement is okay according to California law." Parrish further stated that Buehler and he agreed it "would be fine for [Sbardellati] just to do that and that's what he did."

When Buehler spoke with Sbardellati about sending him the transaction paperwork, Sbardellati told Buehler that as soon as Buehler and the parties reached an agreement on the transaction, he could document the agreement in a written partnership agreement, but if the dealings between Buehler and Parrish became adversarial he could not represent both of them; he could not participate in any negotiation or representation of one contrary to the other. Sbardellati limited his communication with Buehler by avoiding giving advice to him as to anything that was contrary or adversarial to the interests of the other party absent an agreement the subject was acceptable. Sbardellati had the same discussion with Parrish who responded, "That's what we anticipated," indicating he understood and had no problem with this arrangement.

From his having represented Parrish in the past and understanding the previous owner had defaulted on the note secured by the Cloverleaf Apartments, resulting in Parrish's reacquisition of the property, Sbardellati had some concern about the possibility the property could fail to perform. Buehler knew all of these facts and Sbardellati did not disclose his concern to Buehler.

Under these circumstances Sbardellati agreed to represent the partnership, not the individual partners, and to document the agreement in conformity with California partnership law.

Before the transaction closed, Buehler received from the lender a loan guarantee which he signed and caused to be returned without approval of HRRS.[3] Also before the transaction closed Sbardellati drafted an amendment to the limited partnership agreement, labeled as paragraph 5.03, which provided that each of the limited partners would be obligated to contribute

---

[3]There is a conflict in the evidence concerning the circumstances under which the loan guarantee was signed. Sbardellati's proof was that Parrish telephoned Buehler from Texas and told him the lender demanded each partner execute the guarantee or there would be no loan. Parrish told Buehler the guarantee would have the effect of making each partner personally liable for amounts beyond their individual investment. According to Parrish, Buehler was

additional capital to the limited partnership in an amount equal to his percentage ownership if necessary to avoid a default on the guaranteed loan. Paragraph 5.03 was a response to the execution of the guarantees, having a purpose of increasing the partners' basis in the investment under income tax law.

The final draft of the limited partnership agreement was circulated October 9, 1985, and the partners then signed it, acknowledging it in all respects embodied the agreement independently negotiated by Buehler and Parrish.

*The Failure of the Investment*

Texas real estate did not soon recover, and by mid-1987 BD Ltd. had defaulted on the loan and was in bankruptcy, with the limited partners having retained bankruptcy counsel for the entity. In July 1987, for the first time since formation of BD Ltd. in October 1985, Sbardellati was asked to attend a meeting to discuss the deteriorating investment. Sbardellati attended with the understanding he could have no involvement if the situation became adversarial. There was no written waiver concerning legal representation.

In January 1988, Buehler informed Sbardellati the lender was contemplating seeking relief from the stay in bankruptcy. In the meantime, without the knowledge of Buehler or Sbardellati, Parrish had rejected an offer from the lender to accept a deed in lieu of foreclosure.

In April 1989, the lender instituted an action to enforce the personal guarantees. Parrish then informed Buehler he had lost all of his money in the crash of the Texas real estate market.

In July 1989, Buehler asked HRRS to defend his personal interest in the action brought by the lender, but Sbardellati advised Buehler in writing his

aware of the legal significance of the guarantee; it allowed for personal liability of the limited partners beyond the amounts of their partnership contribution.

Buehler received the guarantee on September 23, 1985. He sent a copy to Sbardellati the next day, but signed and returned it to the lender before speaking with Sbardellati. On September 25, 1985, Buehler called Sbardellati and told him he had signed and returned the guarantee. Sbardellati told Buehler that the guarantee effectively made him personally liable for the full amount of the loan and that the lender could enforce the guarantee without first looking to the property. Buehler did not indicate he wanted to set aside the guarantee or otherwise delay the transaction.

Buehler had been told by the lender that it only would seek recourse from the guarantors in the event of a foreclosure if the value of the property was insufficient to cover the existing debt. In a later action to enforce the guarantee against Buehler, he executed a declaration that "I relied on [a recent $1.360 million] appraised value when I made the decision to sign a guaranty despite the fact that I was a limited partner."

request gave rise to a disparity between the interests of the partners. Buehler retained other counsel but was ultimately held jointly and severally liable for the full amount of BD Ltd.'s debt to the lender, with a resultant loss in excess of $700,000.

*Expert Testimony*

Both sides presented expert testimony on the question of Sbardellati's compliance with his professional responsibilities. Sbardellati's experts, Robert Caplan and Richard Sweat, testified that during the July to October 1985 period of the formation of the limited partnership there was no conflict of interest as that phrase is applied and understood by legal practitioners in the community. Since there was no conflict, it was their view no advice to consult separate counsel or written waiver of conflict was required. Specifically addressing the lender's demand all partners execute personal guarantees, both experts agreed this requirement did not create a conflict of interest and thus did not invoke an obligation to refer the partners to separate counsel. Both experts also agreed Sbardellati's discussion with Buehler about the meaning and content of the guarantee conformed with the standard of practice.

Sweat further testified no conflict arose in 1987 when the partnership was in financial difficulty and the partners met with Sbardellati to discuss available alternatives. In addition, Sweat stated that the fact the partners had spoken with a bankruptcy attorney for the partnership indicated they were aware they needed to explore actions that could be taken to protect themselves from any upcoming liability. Moreover, Sweat viewed the later demand letters from the lender as not raising a conflict under the circumstances where the bankruptcy lawyer would be trying to "hold off" the lender and Sbardellati was being seen for the purpose of advising them how the partnership, as a group, could go about making adjustments and try to deal with the problem.

## DISCUSSION

### I

*Buehler's Legal Posture*

Basically, Buehler approaches this case from the standpoint that whether Sbardellati is viewed as undertaking concurrent representation of two clients with adverse interests or was operating under a self-imposed limitation on the scope of his representation, he was unable to provide Buehler the advice

and counsel to be expected of an attorney with " 'undivided loyalty and commitment to the client.' " (*Truck Ins. Exchange* v. *Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1056 [8 Cal.Rptr.2d 228] (*Truck*), quoting *Civil Service Com.* v. *Superior Court* (1984) 163 Cal.App.3d 70, 78, fn. 1 [209 Cal.Rptr. 159].) In either case, Buehler argues, the expectant client must be affirmatively told, in a plain and meaningful way, the attorney will not enforce "to their full extent the rights [and] interests [of the client]" (*Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [293 P. 788]), and that those rights and interests can be adequately guarded only by "seeking independent legal advice" (*Klemm* v. *Superior Court* (1977) 75 Cal.App.3d 893, 901 [142 Cal.Rptr. 509]).

II

*Refusal to Instruct on Attorney's Inability to Narrow Representation Without Disclosure and Consent*

Buehler contends the trial court improperly refused to instruct the jury that an attorney cannot avoid the requirement of informed written consent by narrowing the scope of representation. The refused instruction reads: "An attorney cannot limit the scope of this [*sic*] representation of an existing client in order to accept the representation of another client, if the interests of the two clients are adverse to one another, absent compliance with the California Rules of Professional Conduct requiring the client's fully informed, written consent."

In support of this instruction Buehler cited *Truck*, *supra*, 6 Cal.App.4th 1050, which dealt with a situation in which a law firm representing one client (Fireman's Fund Insurance Company (FFIC)) in defense of two wrongful termination suits agreed to represent another client (Truck Insurance Exchange (Truck)) in prosecuting an action against FFIC for contribution of defense and indemnity costs in underlying asbestos-related bodily injury actions. (*Id.* at p. 1053.) When asked by the law firm if it objected and told the firm would be willing to withdraw as counsel in the wrongful termination cases, transfer that case to new counsel and waive fees for past services, FFIC objected to concurrent representation, refused to provide written consent and stated its desire to have the firm continue as counsel in the wrongful termination cases. (*Id.* at p. 1054.) Nevertheless, the law firm accepted the new representation and moved to withdraw as counsel in the wrongful termination cases. Its first client, FFIC, moved to disqualify the firm from representing Truck in the insurance coverage case. The trial court granted the motion, applying a per se disqualification rule applicable to an attorney attempting to represent an interest adverse to a current client without that client's approval. (*Id.* at p. 1055.)

The Court of Appeal affirmed, citing rule 3-310(B) of the Rules of Professional Conduct of the State Bar[4] (rule 5-102 before May 27, 1989) reading: "A member shall not concurrently represent clients whose interests conflict, except with their informed written consent."[5]

It is obvious that the factual background of *Truck*, involving a law firm's agreeing to represent a new client in bringing suit against an existing client, bears no similarity to this case. *Truck* considered a matter of the law firm's undertaking representation directly adverse to a present client. Nor was there any attempt by the firm in *Truck* to limit the scope of its representation. Rather, there was an attempt by the law firm to make a complete withdrawal from representation of the first client.

In this context, *Truck* held "a law firm that knowingly undertakes adverse concurrent representation may not avoid disqualification by withdrawing from the representation of the less favored client before hearing." (*Truck*, *supra*, 6 Cal.App.4th at p. 1057.) This holding was based on the principle that representation adverse to a present client must be measured against the duty of undivided loyalty which an attorney owes to each of his clients. (*Id.* at p. 1056.)

By contrast, under the evidence in the present case the reasonable inference is Sbardellati and his preexisting clients, Buehler and Parrish, agreed to have Sbardellati represent the limited partnership, BD Ltd., in drafting the already agreed-upon terms of the limited partnership agreement. There was no concurrent representation adverse to a present client on the part of Sbardellati. Thus, having no bearing on this case, *Truck* does not furnish authority for giving the instruction on limited representation.

Nor does *Nichols* v. *Keller* (1993) 15 Cal.App.4th 1672 [19 Cal.Rptr.2d 601], decided after the trial of this case and relied on by Buehler, support giving the instruction. *Nichols* involved no question of conflicts in the interests of clients. Rather, what was at stake was the duty of attorneys involved in adjudication of a workers' compensation claim (by means of one attorney's filling out an application to adjudicate the claim and another attorney's accepting a referral to prosecute it) to advise the claimant on other available remedies, including third party claims. *Nichols* held such a duty to advise the client exists, stating "if counsel elects to limit or prescribe his representation of the client, i.e., to a workers' compensation claim only

---

[4] All references to rules are to the Rules of Professional Conduct of the State Bar of California.

[5] Rule 3-310 has been amended effective August 13, 1992, by the addition of several subparagraphs.

without reference or regard to any third party or collateral claims which the client might pursue if adequately advised, then counsel must make such limitations in representation very clear to his client." (*Id.* at p. 1687.) This ruling concerning duties of attorneys connected with litigating workers' compensation claims, of course, has nothing to do with the facts in the present case. More important, *Nichols* has nothing to do with alleged conflicts of interest, concurrent representation or the need to obtain a "client's fully informed, written consent," as addressed in the refused instruction. Thus *Nichols*, too, does not support giving the instruction.

General principles of law do not support giving the instruction, since the record clearly shows Sbardellati, Buehler and Parrish understood from the beginning that Sbardellati was to represent the partnership, not the individual partners, and to document the agreement Buehler and Parrish had reached in conformity with California law. Buehler understood Sbardellati could not participate in any negotiation or representation of one partner contrary to the other. Since Sbardellati was representing the partnership, this understanding did not constitute a limitation of his representation of Buehler. Accordingly, the record does not support the instruction and it was properly refused.

One final point on Buehler's assertion of error in refusing the instruction on limited scope of representation is that the last part of the instruction referring to the requirement there be fully informed, written consent if the clients' interests are adverse to one another is covered by the instruction the court gave pursuant to (former) rules 4-101 and 5-102(B). (See *post*, p. 1543.) Thus, aside from the aspect of the asserted limitation of representation, there was no need to duplicate the informed written consent instructions.

### III

*Instruction on Attorney's Representing Partners Pursuing a Common Goal*

■ Here, Buehler contends the court improperly instructed the jury at Sbardellati's request: "If you find that the partners to this transaction sought to accomplish a common end result and engaged the services of the defendant to implement their joint plan, then the defendant's representation of their joint interests does not give rise to a conflict."

Buehler acknowledges the instruction is "presumably based on" *Moxley* v. *Robertson* (1959) 169 Cal.App.2d 72, 75 [336 P.2d 992], the case Sbardellati cited in his request for the instruction. He argues, however, the significance of *Moxley* "is limited to the situation where two individuals have already

formed an enterprise, and thereafter the 'enterprise' requests the representation of one attorney to pursue *its* goals . . . [and is] further limited to the situation where one of the participants to that enterprise seeks to void an agreement between the enterprise and an unrelated party, as opposed to the situation where a participant pursues a malpractice claim directly against an attorney by virtue of the attorney's conflicting representation."

The record in this case shows Buehler and Parrish had "already formed an enterprise," leaving only to Sbardellati, as attorney for the limited partnership, to memorialize it under California limited partnership law. Thus, Buehler's case is subject to the application of *Moxley* in which the court states in part, "Because of their joint purpose, it does not appear that the interests of the two plaintiffs conflicted . . . . In the case before us the two plaintiffs sought to accomplish a common end result and engaged the services of a single attorney to implement their joint plan. . . . [¶] . . . That [appellant-coplaintiff] would have been better off not to have entered into the transaction with his coplaintiff does not in and of itself constitute a conflict of interest . . . ." (*Moxley* v. *Robertson, supra*, 169 Cal.App.2d at p. 75.)

As to Buehler's second attempted distinction of his case from *Moxley* on the basis his is an action for malpractice whereas *Moxley* involved an action against a third party, this is a distinction without a difference. *Moxley's* statements there was no conflict of interest in the one attorney's representing two clients (a) for their joint purpose, (b) to accomplish a common end result and (c) to implement their joint plan, are applicable to any such set of facts without regard to the type of litigation involved.

The instruction that an attorney's representation of partners pursuing a common end result does not constitute a conflict of interest was supported by the evidence and *Moxley*. It was properly given in this case.

As a result of this conclusion it is unnecessary to address Buehler's related contention of error in the court's selecting Sbardellati's requested instruction while rejecting Buehler's proposed special instructions (labeled 67 and 76) which state that "[a] conflict between jointly represented clients occurs whenever their common lawyer's representation of the one is rendered less effective by reason of his representation of the other," (No. 67) and: "The Rules prohibiting the simultaneous representation of clients whose interests are adverse to one another without the client's fully informed, written consent apply to all types of legal employment, including the representation of multiple parties in a single transaction or other common enterprise or legal relationship. An example of the latter would be the formation of a partnership for several partners." (No. 76.)

To the extent the first instruction correctly states the law, it was covered by the instruction the court gave that ". . . [t]he attorney is precluded from assuming any representation which would prevent him from devoting his entire energies to his client's interest." Under the rules and decisional law applicable in 1985 the second instruction, as we have seen, is inconsistent with *Moxley* and would have been in direct conflict with the instruction given.[6] It was properly refused.

## IV

*Precluding Buehler From Arguing Sbardellati's Legal Files Contained Evidence Showing Conflict of Interest*

■ While recognizing Evidence Code section 913, subdivision (a)[7] prohibits comment on the fact a privilege had been exercised, Buehler contends the unique circumstances of his case made "unwarranted, improper, and prejudicial" the court's pre-argument ruling he was not to comment on Sbardellati's exercise of the attorney-client privilege with respect to Parrish's file during the discovery stage. After Sbardellati's exercise of the privilege but before trial, Parrish waived his privilege in exchange for a full release from Buehler, resulting in the production of these documents. During trial Sbardellati acknowledged he had produced documents to Buehler but had asserted the privilege as to Parrish before Parrish waived the privilege.

Buehler sought to argue that Sbardellati's exercise of the privilege impeached his claim he viewed his role as attorney only for the limited partnership, and that the attorney-client privilege prohibited Sbardellati from ever obtaining Buehler's informed consent, on account of the fact Sbardellati would have had to reveal the very same confidences he refused to reveal based on the attorney-client privilege. The trial court disallowed this argument.

While Buehler makes a facially appealing argument for permitting him to address the jury on the fact of Sbardellati's assertion of the attorney-client

---

[6]This conclusion does not consider the recent changes in the rules, particularly the 1992 addition of subparagraph (C)(1) to rule 3-310 reading, "A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients *potentially* conflict; . . ." (Italics added.)

[7]Evidence Code section 913 reads in full:

"(a) If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding.

"(b) The court, at the request of a party who may be adversely affected because an unfavorable inference may be drawn by the jury because a privilege has been exercised, shall instruct the jury that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."

privilege under the circumstances of his case, he fails to take into account the absence of any exception in the statutory prohibition of Evidence Code section 913 on such comment, and he does not consider the fact (which he acknowledges[8]) that privileged material other than simply that pertaining to the limited partnership was at stake when Sbardellati exercised the privilege. Given these considerations, it is clear there was no abuse of discretion in the court's refusing to allow Buehler to argue to the jury about inferences from the exercise of the privilege. The court's ruling complied with the statutory prohibition against such comment.

## V

*Substantial Evidence of No Negligence*

■ Buehler contends substantial evidence does not support the jury's special verdict that Sbardellati did not commit any negligence. To make this point Buehler references his statement of facts, which draws inferences and states conclusions *not* in support of the judgment, particularly demonstrating his apparent rejection of the concept that Sbardellati represented the limited partnership in the matter. Moreover, he fails to cite evidence of his own admission that at the very beginning of the representation concerning BD Ltd., in August 1985, Sbardellati told him that if the dealings between Buehler and Parrish became adversarial, Sbardellati could not represent both of them. In addition, there is substantial evidence that after Sbardellati spoke to them about a potential conflict of interest, Buehler and Parrish agreed it was no conflict of interest for him to document the limited partnership agreement. Concerning the guarantee, there is substantial evidence Buehler signed it without first consulting Sbardellati and with correct knowledge of its legal effect. No conflict of interest or other malpractice concern attends Buehler's signing the guarantee.

We cannot reverse the judgment as Buehler requests. The rules governing appeals are firmly established: "[A]ll of the evidence must be examined, but it is not weighed. All of *the evidence most favorable to the respondent must be accepted as true*, and that unfavorable discarded as not having sufficient verity, to be accepted by the trier of fact. *If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.*" (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384], italics added; see also *Nestle* v.

---

[8]Buehler states that after Parrish waived the attorney-client privilege in exchange for the release from Buehler, only a "fair number" of these withheld documents revealed communications between Sbardellati and Parrish concerning the limited partnership. The clear inference from this statement is the remainder of the documents did not pertain to the limited partnership and were properly subject to Sbardellati's assertion of the privilege at the time he made it, before Parrish's waiver.

*City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

Accordingly, we find Buehler's substantial evidence argument has no merit. There is no proper basis on which to draw a conclusion of breach of duty as a matter of law. (Cf. *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 150 [65 Cal.Rptr. 406, 28 A.L.R. 368].)

VI

*Separate Cause of Action for Breach of Fiduciary Duty*

█ Buehler asserts the trial court erroneously concluded that a cause of action for breach of fiduciary duty does not exist separate and apart from a cause of action for negligence. The parties inform us that in an unreported conference the court ruled either that "a cause of action for breach of fiduciary duty does not exist separate and apart from a cause of action for negligence in an action for legal malpractice," according to Buehler, or that "[Buehler's] claim for breach of fiduciary duty was subsumed in his cause of action for professional negligence," according to Sbardellati. The jury thus was not instructed on the separate cause of action for breach of fiduciary duty as pled in Buehler's complaint. Nevertheless, the jury was fully instructed under the cause of action for professional negligence on an attorney's duty to the client, including instructions that it is a duty of an attorney to comply with the Rules of Professional Conduct and a failure to do so constitutes negligence. In this connection the court instructed on former rules 4-101 and 5-102(B) (now rules 3-300 and 3-310) as follows:

"Rule 4-101 of the California Rules of Professional Conduct, in effect in 1985, provided:

"A member of the State Bar shall not accept employment adverse to a client or former client, without the informed and written consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client."

"Rule 5-102 of the California Rules of Professional Conduct, in effect through mid-1989, provided:

"(A)  A member of the State Bar shall not accept professional employment without first disclosing his relation, if any, with the adverse party, and his interest, if any, in the subject matter of the employment. . . .

"(B) A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned."

Moreover, the court instructed in language closely parallel to that in the leading case on an attorney's duty to the client, *Day* v. *Rosenthal* (1985) 170 Cal.App.3d 1125, 1143 [217 Cal.Rptr. 89], (largely quoting from *Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 715-716 [201 Cal.Rptr. 528]) that: "It is an attorney['s] duty to protect his client in every possible way. An attorney violates that duty by agreeing to represent another client whose interests are adverse or antagonistic to the first client without the latter's free and intelligent consent given after full knowledge of all the facts and circumstances. The attorney is precluded from assuming any representation which would prevent him from devoting his entire energies to his client's interests."

In Buehler's closing argument he devoted considerable attention to the matter of the attorney's professional duties.

On this record it is clear the jury received the instruction on fiduciary, professional duty to which Buehler would have been entitled if there had also been instructions on the second pled cause of action for breach of fiduciary duty. The jury also heard argument on this theory. Accordingly, the record shows Buehler was accorded his "right to independent jury *consideration* of each theory presented by the instructions and supported by the evidence." (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R. 158], original italics, disapproved on another point in *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 574-581 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*).) Yet, the jury did not find in Buehler's favor on the question thus presented to it concerning whether Sbardellati breached his professional duties to Buehler.

This record demonstrates there is no reasonable probability of a different result even if we assume error in the court's conclusion the breach of fiduciary duty cause of action is subsumed in the professional negligence cause of action.[9] Thus we are precluded from reversing the case. (Cal. Const., art. VI, § 13; *Soule, supra,* 8 Cal.4th at pp. 576, 580-581; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

---

[9] We note it has been stated, "The breach of the fiduciary obligations, sometimes characterized as 'constructive' fraud, has been appropriately recognized as an action in tort, not contract. The tort constitutes a wrong which is distinct and independent from professional negligence but still [comprises] legal malpractice." (1 Mallen & Smith, Legal Malpractice (3d ed. 1989) ch. 11, § 11.1, p. 633, fns. deleted.)

Thus, there is authority for the view the breach of fiduciary duty theory is separate from the professional negligence theory. In light of the harmless error involved in this case, we leave any resolution of this separate cause of action question to another case.

## Disposition

Judgment affirmed.

Benke, Acting P. J., and Huffman, J., concurred.

On June 19, 1995, the opinion was modified to read as printed above.