*1026
 
 Opinion
 

 HASTINGS, J.
 

 The case presents a unique fact situation involving a courtesy defense provided to Dr. Neil Jouvenat, an uninsured physician, by appellant, Southern California Physicians Insurance Exchange (hereinafter SCPIE), which resulted in a jury verdict against SCPIE for fraud and conspiracy to breach fiduciary duty. Although the instant appeal involves only one plaintiff, one defendant and two counts, it is inextricably intertwined with two prior legal proceedings.
 

 The first is the underlying medical malpractice action, brought by Ashley Hughes (Ashley), a quadriplegic, ventilator-dependent minor, and various family members, against Jouvenat and other defendants for debilitating medical injuries she suffered in their care during her delivery and the first few days of her life (hereinafter referred to as the personal injury action).
 

 The second involves a bankruptcy petition filed by Jouvenat shortly after the verdict was rendered in.the personal injury action. Respondent Robert Mosier was appointed the interim bankruptcy trustee for Jouvenat’s estate.
 

 The instant action was prosecuted by Mosier based upon allegations that SCPIE defrauded Jouvenat by inducing him to accept the courtesy defense and conspired to breach fiduciary duties owed to Jouvenat by counsel retained by SCPIE, Darrell Forgey, of the law firm of Hillsinger & Costanzo.
 
 [1]
 
 After a seven-week trial, a jury found the allegations true and concluded that the original allocation of fault against Jouvenat in the personal injury action, 70 percent, should have been only 40 percent. A judgment was subsequently entered against SCPIE, directing it to pay Mosier, an interim trustee for the bankruptcy estate of Jouvenat, $4,221,078.90 in compensatory damages, $14 million in punitive damages and $24,311.82 in costs.
 

 SCPIE appeals, raising numerous issues. After a thorough review of the record, while we conclude there is sufficient evidence to support the findings of the jury relating to fraud and breach of fiduciary duty, we conclude there is insufficient evidence to support a finding that Jouvenat was injured or that the compensatory damages are causally related to SCPIE’s breaches of duty.
 

 Statement of Facts
 

 We review the facts, bearing in mind that we must resolve all evidentiary conflicts favorably to respondent Mosier and accord him the benefit of all
 
 *1027
 
 reasonable inferences which can be drawn from the evidence.
 
 (Campbell
 
 v.
 
 Southern Pacific Co.
 
 (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121];
 
 Hasson
 
 v.
 
 Ford Motor Co.
 
 (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].)
 

 Background Facts
 

 The facts regarding Ashley’s birth are, for the most part undisputed. She was bom on March 31, 1987, at Pomona Valley Hospital (the Hospital). Her mother, Kristy, was a minor and Ashley’s legal guardian at all pertinent times was her grandmother, Linda Hughes.
 

 Jouvenat, Kristy’s obstetrician-gynecologist, had been on the Hospital staff since 1985. As part of the offer of employment, the Hospital had agreed to pay his malpractice insurance premiums, and Jouvenat had secured malpractice coverage through SCPIE. Prior to Ashley’s birth, a dispute arose between the Hospital and Jouvenat relating to the tax consequences of the Hospital’s payment of Jouvenat’s malpractice premiums. As a result of this dispute, the Hospital stopped paying the premiums, and at the time Ashley was bom Jouvenat’s policy with SCPIE had lapsed. Following Ashley’s birth, SCPIE agreed to retroactive reinstatement of the insurance, but without coverage for the incident relating to the birth of Ashley. Thus, Jouvenat was uninsured for this incident.
 

 The delivery of Ashley was difficult, and Jouvenat utilized a forceps procedure in a manner not authorized by the Hospital. Due to Ashley’s position in the birth canal and the direction in which Jouvenat turned her, Ashley’s neck was twisted 180 degrees, resulting in severe injury to her spinal cord.
 

 Immediately after her birth, Ashley was transferred to the care of the Hospital’s staff neonatologists, Drs. Andrew Hsu and Yu-Sheng Wu (collectively referred to as Hsu and Wu), and Dr. Kong-Tay Wu. (To avoid confusion, Dr. Kong-Tay Wu will always be referred to by his full name, while Dr. Yu-Sheng Wu will be referred to only as Wu or Dr. Wu.) At this point, no one was aware that any injury to Ashley had occurred during delivery, although it was clear that she was not in good health. Ashley was placed in intensive care while the neonatologists attempted to ascertain what was wrong with her. She was treated for breathing difficulties and four days later she was referred to the care of a pediatric neurologist who misdiagnosed her as having a rare congenital disease called Werdnig-Hoffman syndrome. The neonatologists informed Ashley’s family that Ashley probably would not survive.
 

 
 *1028
 
 Ashley was transferred to Loma Linda Hospital where the spinal cord injury was properly diagnosed. Because of the spinal cord injury, Ashley was rendered a quadriplegic. She is also dependent on a ventilator to breathe.
 

 The Personal Injury Lawsuit
 

 Ashley’s legal guardian, Ashley’s mother and Ashley’s aunt (who was in the delivery room) brought a lawsuit against Jouvenat, the Hospital, Drs. Hsu and Wu, Dr. Kong-Tay Wu, and the pediatric neurologist Dr. Rice. These plaintiffs were represented by Attorney Bruce Fagel.
 

 The theory against Jouvenat was that his manner of delivery had caused a lesion to the spinal cord, resulting in Ashley’s quadriplegia and ventilator dependency. The theory of recovery against the neonatologists was that they had aggravated the original injury caused by Jouvenat. It was asserted that had the neonatologists timely diagnosed the spinal cord injury and promptly treated it with steroids, as recommended by a leading pediatric textbook, Ashley would not be dependent on a ventilator to breathe. It was also alleged that Hsu and Wu had fraudulently covered up Jouvenat’s negligence and their own failure to diagnose the injuries to Ashley.
 
 [2]
 

 Jouvenat initially engaged the services of Attorney George McDonald; however, McDonald withdrew for nonpayment of fees two years before trial commenced, leaving Jouvenat to represent himself. While Jouvenat was representing himself, he testified in a deposition that he had problems with alcohol and drug abuse during the time period immediately prior to and after Ashley’s birth. However, he disputed that he had actually been under the influence at the time of delivery in March 1987.
 
 [3]
 

 The three neonatologists, Hsu and Wu, and Kong-Tay Wu, were insured by SCPIE. Policy limits for Hsu and Wu were $6 million, collectively. SCPIE retained Marshall Silberberg, of the law firm of Baker, Silberberg and Keener (BSK), to represent Hsu and Wu. It retained another law firm to represent Kong-Tay Wu.
 

 A few days prior to the scheduled trial, Silberberg and SCPIE jointly came to the conclusion that it would be disastrous to have Jouvenat appear at the
 
 *1029
 
 trial unrepresented by counsel. This conclusion was at least partly based upon the sympathetic plight of Ashley, the allegations of drug abuse and alcoholism against Jouvenat, and the potential joint and several liability among the doctors. They feared that without a joint defense, the damages would be monumental. The decision was made to offer Jouvenat a “courtesy defense,” that is, SCPIE would select and pay for an attorney to represent Jouvenat at trial, but it was emphasized that Jouvenat would not receive indemnity. As a result, Lee Breitbarth of SCPIE asked Forgey, a local attorney who had previously done a substantial amount of work for SCPIE, to undertake the representation of Jouvenat. Forgey agreed and substituted in as Jouvenat’s counsel on the day trial was initially scheduled to begin. The trial was ultimately continued to a date a few months later.
 

 Prior to trial, the Hospital, and Kong-Tay Wu settled with Ashley in the aggregate amount of $3,234,539.
 

 During trial, Jouvenat, on Forgey’s advice, admitted liability, leaving only the liability of Hsu and Wu to be addressed during the plaintiffs’ case-in-chief. Forgey presented a joint defense with Hsu and Wu and did not argue to the jury that Jouvenat’s percentage of responsibility for Ashley’s injuries should be reduced to take into account the negligence of Hsu and Wu in aggravation of the injury. The jury returned with a verdict in Ashley’s favor, finding Jouvenat 70 percent at fault and Hsu and Wu each 15 percent at fault. The jury also concluded that Hsu and Wu were each guilty of intentionally concealing or suppressing material facts concerning Ashley’s medical condition.
 

 Hsu and Wu made a posttrial motion, which Forgey did not oppose, to credit the amount of the prior settlements against the judgment. Prior to the entry of judgment, and the ruling on their motion, SCPIE settled with the plaintiffs on behalf of Hsu and Wu for less than their pro rata share of the judgment. Judgment was then entered against Jouvenat, in the amount of $9,849,184, plus costs. This amount represents Jouvenat’s 70 percent apportioned fault damages after offset of the settlement amounts between plaintiffs and the Hospital and Kong-Tay Wu, and subtraction of the 30 percent apportioned fault damages assessed against Hsu and Wu.
 

 The Bankruptcy Proceedings
 

 Before the judgment was entered in the personal injury action, Jouvenat filed a chapter 7 bankruptcy petition upon the advice of his bankruptcy counsel, with which Forgey concurred. In his petition, he listed assets of $32,083 and liabilities of $10,198,817, including the judgment in favor of Ashley.
 

 
 *1030
 

 This Action
 

 As part of his duties as bankruptcy trustee, Hosier brought this action against SCPIE. Originally, the complaint contained 20 assorted causes of action, on behalf of Hosier, Jouvenat, and Ashley, against the Hospital, Breitbarth, SCPIE, Hillsinger & Costanzo and Forgey. Bruce Pagel, who had been Ashley’s attorney in the personal injury action, represented the plaintiff in this action.
 

 By the time the matter was submitted to the jury, the case had been whittled down to two causes of action by Hosier against SCPIE.
 
 [4]
 
 The basic theory upon which the action proceeded was that SCPIE, having the goal of paying as little as possible on behalf of Hsu and Wu, agreed to retain Forgey, an attorney it knew and trusted, to carry out a litigation strategy devised by SCPIE to have the jury place greater blame on Jouvenat than on SCPIE’s insureds, Hsu and Wu, all without the knowledge of Jouvenat. Forgey, Hosier alleged, continued to meet and plan trial strategy with SCPIE as if SCPIE were his client. At issue were several of the decisions Forgey had made during the medical malpractice action: the decision to have Jouvenat admit liability and present a joint defense with Hsu and Wu;
 
 [5]
 
 the decision not to call a designated expert witness, a Dr. Hartin, who may have been helpful in Jouvenat’s defense; the decision not to assign Jouvenat’s rights to a bad faith action against SCPIE after the verdict had been rendered; the decision not to oppose the posttrial motion of Hsu and Wu to credit the judgment with the amount of the pretrial settlements; and the prodding of Jouvenat to file bankruptcy.
 

 At trial, various SCPIE personnel testified about their involvement in the matter. All of them denied there had been a plan to use Jouvenat to deflect liability from Hsu and Wu. Hargaret HcComb and Donald Zuk, the most senior personnel of SCPIE, denied knowing anything about the matter for the most part, claiming they did not recall the substance of their conversations about the case, and basically placing the responsibility for the decision to offer a courtesy defense on SCPIE’s attorney, Harshall Silberberg.
 

 Breitbarth, the SCPIE employee with the most intimate knowledge of the case, was unavailable to testify at trial due to illness; instead, his deposition testimony was presented. He testified that he had assumed responsibility for Ashley’s claims file in 1990 as a senior claims supervisor because it was a
 
 *1031
 
 so-called “bad baby” case with high liability exposure.
 
 [6]
 
 The idea of a “courtesy defense” had been suggested to Breitbarth in correspondence from Silberberg. At the time, Breitbarth had been advised by Silberberg that the case against Hsu and Wu was strongly defensible, and Silberberg also believed there was little, if any, possibility of credible evidence being produced on the issue of fraudulent concealment. Based on Silberberg’s information, Breitbarth seriously questioned the defensibility of the case against Jouvenat. However, aware of Jouvenat’s past history of substance abuse and the fact that he was representing himself, he felt the idea was a valid one. According to Breitbarth, “it was our impression that by paying for an attorney to represent Dr. Jouvenat. . . this would assist him in preparing for and giving more effective trial testimony from his perspective and that this could possibly—would hopefully inure to the defensibility of the case as related to Dr. Hsu and Wu.” Breitbarth had no recollection of a courtesy defense ever being offered before by SCPIE. Thinking the suggestion had merit, he had passed it on to his superior, Ken Beck.
 

 Beck set up a meeting with Margaret McComb and Breitbarth. At this meeting, McComb had asked whom they would recommend to represent Jouvenat, and Breitbarth suggested Forgey, with whom he had worked in the past. He felt Forgey was more “laid back” than other attorneys and would have a calming influence on Jouvenat. McComb discussed the proposal with Silberberg, and then with her superior, Zuk. Neither McComb nor Beck ever discussed whether a potential conflict of interest existed between Jouvenat on the one hand and Hsu and Wu on the other. After the courtesy defense concept was approved, Beck directed Breitbarth to contact Forgey and Jouvenat.
 

 Breitbarth telephoned Jouvenat about the proposal, and after a brief conversation, Jouvenat accepted the offer. Breitbarth did not tell Jouvenat that he had a right to choose his own attorney: “My opinion was since this was not a conflict case within the meaning of Civil 2860 [see
 
 infra],
 
 there was no reservation of rights involved here whatsoever and SCPIE had the right to choose counsel in this instance.”
 

 Breitbarth assumed that all defense counsel would work together “to the extent it was appropriate” to bring about the “best possible result at trial.” He defined the “best possible result” as a defense verdict for Hsu and Wu, or damages below or near $3.8 million. He knew that Jouvenat would sustain damages, however, he expected Forgey to provide Jouvenat with a competent defense and Breitbarth was prepared to provide whatever financial assistance was necessary, including payment of experts on behalf of Jouvenat.
 

 
 *1032
 
 On May 29, 1991, the day trial began, Forgey called Breitbarth and advised him that motions
 
 in limine
 
 relating to Jouvenat’s use of drugs and alcohol had been denied and it was Forgey’s intent to strongly recommend to Jouvenat that he consider admitting liability and trying the case strictly on damages. That same day, Breitbarth forwarded a memorandum to McComb, with a copy to Beck, on the subject matter of the conversation and opined as follows: “If Jouvenat admits liability, our Insureds would hopefully not be tainted by proximity of the inflammatory evidence since it would not be directly admissible. If Fagel tries to ‘backdoor it,’ [Forgey] would, of course, strenuously object and move to strike.”
 

 The next day, Breitbarth sent another memorandum to McComb: “Good news! [Silberberg] advises that [Forgey] was successful in getting [the] Judge ... to bar evidence of substance abuse as to Dr. Jouvenat. [Forgey] sought permission to try the case solely on damages and the Court concurred. We will finish selecting jurors today and Opening Statements will begin tomorrow. Fagel will now have to put [ ] on his liability case against our two Neonatologists and later the Damages case as to ours plus Dr. Jouvenat.” Forgey also forwarded separate letters to Breitbarth and Jouvenat the same date reporting on this development.
 

 Forgey testified that his first contact on this case was when he received a telephone call from Breitbarth on March 7, 1991.
 
 [7]
 
 He was advised that SCPIE would be giving a courtesy defense to Jouvenat but that SCPIE would not indemnify Jouvenat or pay to take an appeal on behalf of the doctor. Forgey could not recall ever having been involved in a “so-called courtesy defense” before. He did no research on the issue and did not discuss with anyone the legal or ethical ramifications of representing an uninsured client in such a case.
 

 The next day, Forgey met briefly with Silberberg, and spent several hours going over Silberberg’s file. Although he spoke briefly with Jouvenat on March 8, he did not meet with Jouvenat until March 11, the date initially scheduled for trial. On that date, trial was continued to April 1.
 

 On March 26, 1991, Forgey sent a memorandum to Bruce Bolger, head of the law and motion department of his firm. The document was introduced into evidence and reads as follows:
 

 “Here is a turkey of a case in which we just substituted in.
 

 
 *1033
 
 “The defendant (uninsured) is contemplating bankruptcy and I believe, as does his bankruptcy counsel, that he should proceed.
 

 “Please give me your opinion relative to this as soon as conveniently possible. We have been ordered to return to the Pomona Superior Court on Monday, April 1, 1991 and I would anticipate that the trial of this action will probably commence the week of April 8 or April 15.
 

 “Any other thoughts you might have would-be appreciated.”
 

 The same date, Forgey sent a letter to Breitbarth advising him that he had met with Jouvenat and discussed the case. He advised Breitbarth that he had spoken with Jouvenat’s bankruptcy attorney, Victor Tessier, and Jouvenat was leaning towards filing for bankruptcy. He also advised Breitbarth: “It would appear that [Jouvenat] has put his life in order and the last thing he needs is a large multimillion dollar judgment against him hitting the newspapers.”
 

 In response to Forgey’s memorandum, on March 29, 1991, Bolger sent a memorandum to Forgey. This document was introduced into evidence and, pertinent to our discussion, states the following:
 

 “1. I assume the
 
 Cumis
 
 situation has been thoroughly discussed with the doctor, and that the ‘consent to representation’ by our firm that the doctor has signed will suffice as a
 
 Cumis
 
 waiver. (I am not sure as to the nature of any coverage dispute between SCPEE and the doctor.)[
 
 8
 
 ]
 

 “3. Should any consideration be given to admitting liability in the case? (On the other hand, I note from Susan Robin’s memo of March 14, 1991 that plaintiff’s expert had ‘almost no criticisms’ of our client.)”
 

 At trial, Bolger was asked about item 1 of this memorandum and testified: “[I]t appeared to me that this appeared to be or seemed to be a
 
 Cumis
 
 situation or a
 
 Cumis
 
 type of situation in the sense that this doctor was apparently uninsured, yet at the same time the insurance company was bringing our firm into the case to represent him. So that—that was a little unusual to me, so I thought that this might be a
 
 Cumis
 
 situation or akin to or a type of a
 
 Cumis
 
 situation.” (Italics added.)
 

 
 *1034
 
 At trial, Forgey was asked about these memoranda and what discussions he had had with Bolger about them. He testified he did not believe this was a
 
 Cumis
 
 situation, he never considered doing any research on the
 
 Cumis
 
 issue, and he did not seek or obtain a
 
 Cumis
 
 waiver from Jouvenat. With regard to the comment by Susan Robins, Forgey had asked for her impressions of the client. She forwarded a memorandum to him dated March 14, 1991, which was read to the jury. The relevant portion states: “Oh yes, I certainly do remember Dr. Jouvenat (sp)! The case is in a rather interesting posture—plaintiff’s OB expert - Mac Wade - had almost no criticisms of Dr. Jouvenat, because Bruce [Fagel] was trying to set the case up against codefendants with insurance or assets. Baker, Silberberg & Keener has the only viable OB expert (Ian Ross Donald, M.D.). I believe he was deposed. He can be called by Bruce, if Bruce decides to play it that way.”
 
 [9]
 

 Forgey admitted that Jouvenat desired to testify at trial but that Forgey had dissuaded him. While Jouvenat did not believe that he had been negligent, and had recently begun putting his life back together, he “expressed a desire to get on the stand and basically make a mea culpa and say: Yes, I did have problems with drugs and alcohol.” Forgey was concerned about the effect the admission of dmg and alcohol use may have had on the jury. He was concerned that an award of punitive damages or a finding of willful misconduct might result in a non-dischargeable judgment in bankruptcy, therefore, he opted to advise Jouvenat to admit liability.
 

 Forgey admitted that he had been aware of Dr. Martin, an expert witness previously identified by Jouvenat’s prior attorney, who was critical of the neonatologists, but he chose not to call him at trial because he did not want to “get into a finger-pointing exercise with [Hsu and Wu] and with Mr. Silberberg in view of the fact that we had admitted liability.” Instead, he relied on the information given him by SCPIE’s experts. He admitted sending regular updates to SCPIE, “to keep the lines of communication open” and said that no one at SCPIE ever told him to stop sending letters. He had told McComb after the trial that he felt he had “let SCPIE down.” However, he denied he would ever “throw” a case.
 

 Several documents were introduced at trial. Primary in importance was a memorandum from Lee Breitbarth to the file, describing a “Plan B.” As pertinent, the document reads: “Re. meeting this A.M. between [McComb], Ken [Beck] and myself. I proposed that we initiate Plan ‘B’ at this time, that being to offer a courtesy defense to the uninsured OB/GYN, Dr. [Jouvenat].
 
 *1035
 

 This will enable us to maintain control and mitigate the impact of negative testimony anticipated from [Jouvenat],
 
 I suggested we retain the services of attorney Darrell Forgey for this purpose. Ken [Beck] had already mentioned this approach to [McComb] and she, in turn, had discussed the matter with Don Zuk. [McComb] advises that she and [Zuk] are fully in support of this new approach and I may contact [Forgey] to defend Dr. [Jouvenat] asap. [¶] • • • [¶] I phoned Darrell Forgey and invited him to participate by defending Dr. [Jouvenat], I explained that we believed it best to afford him a courtesy defense. I then explained the nature of the case to [Forgey] and extended Marshall Silberberg’s invitation to bring him fully up to speed before the next Trial appearance date of 3/11/91. [Forgey] was pleased that we would ask him and readily accepted. He will contact Marshall [Silberberg] immediately and be prepared to answer ‘ready’ on Monday.” (Italics added.)
 

 An office memorandum from Breitbarth to McComb dated June 12, 1991, reported on Breitbarth’s monitoring of the trial and reflects the following: “Plaintiff first called the uninsured OB/GYN, Dr. Jouvenat. [Silberberg] tells me that Fagel did not spend much time with him (as you know, Dr. Jouvenat conceded liability) and was not able to elicit any damaging testimony as to our two insureds. Mr. Forgey says Dr. Jouvenat will not be recalled to testify again. . . . [¶] As to the issue of the alleged ‘conspiracy of silence,’ I believe, as do both [Silberberg] and Forgey, that Drs. Wu and Hsu laid it to rest. However, I anticipate that Fagel will do his best to try to resurrect it before he closes his case. . . . [¶] ... At this point it would appear that we are ahead on points. It is still early and too soon to call it; however, if Fagel can’t do better than he has thus far, [Silberberg] will not need to put on as extensive a case as first anticipated. He may elect not to belabor points made by Fagel during his case.”
 

 On June 14, Breitbarth sent another update memorandum to McComb, this time indicating that Fagel had “got[ten]” to Hsu during cross-examination and “beat him up pretty good.” He also noted that one- of nurses from the Hospital “obviously has an ‘ax to grind’ as to Drs. Hsu and Wu.” The memorandum concluded: “At this point in Plaintiff’s case, [Forgey] and I view the possible outcome as at least 50/50. [Silberberg] thinks he has the edge. This is not too bad since Fagel is now taking his best shot at proving two allegations: 1) Conspiracy and 2) Failure to give steroids early, particularly in view of the suspicion of cord injury.”
 

 Another update was sent on June 18, 1991, reporting on the effect of plaintiffs’ expert Dr. Andy Moosa. The summarized testimony indicated that he had three areas of criticism against the neonatologists: (1) failure to suspect spinal cord injury; (2) failure to splint the baby’s neck; and “3) They
 

 
 *1036
 
 should have given steroids in small doses to inhibit swelling which further compressed the cord exacerbating the condition, [¶] Dr. Moosa testified that had they done the above (even if Dr. Rice had done it three days post-delivery), the outcome could have either been everted |>zc] or mitigated to a great extent. He claims he knows of cases of cord injury where steroids were given and the child was completely normal after 1 1/2 years!! [¶] Moosa went on to criticize Drs. Hsu and Wu for not communicating with either the parents (ie. [szc] giving them the option to elect to use steroids on their child) or the Neonate RNs whose input was of vital importance.”
 

 On June 21, 1991, Breitbarth sent an update memorandum with regard to plaintiff’s expert Dr. John Menkes. Menkes was critical of the neonatologists and testified that there was a “window of opportunity” of about four to eight hours in which to diagnose a cord injury and begin treatment with steroids. “He believes that if the steroids are given in the appropriate dose early enough, there is a good chance to get a ‘significant’ improvement in the child’s motor function.”
 

 Mosier also introduced into evidence Forgey’s billing records and correspondence, which demonstrated a continued contact with SCPIE during the trial regarding the substantive aspects of the case. One of the letters, dated May 14, 1991, advised Breitbarth that trial could be expected to start on May 28, 1991, and “it is easy to compute that a verdict in this case could be in the $10 million to $15 million range.” Finally, there were several letters which Forgey wrote to SCPIE regarding matters of consequence, which he admitted were not sent to Jouvenat.
 

 Jouvenat testified and recalled Breitbarth calling him and advising that SCPIE would provide a defense for him “to help me keep the damages down for myself and defend me in trial.” At the time, representing himself and with trial scheduled for the next week, he had not sent out any subpoenas, designated any expert witnesses, or prepared to have any other witnesses available. He also had no funds to pay for these trial costs. He had been a bit perturbed that the call came so late but he had no other viable options and was relieved that SCPIE would be providing him with an attorney. He trusted SCPIE because, except for the lapse of coverage when this case arose, it had been his insurance carrier up to that time. He understood that this offer of defense would allow him to “have an opportunity to state my case to defend me throughout the entirety of the Hughes matter.” At the time he believed that he was not negligent or liable for the injuries to Ashley.
 

 Neither Forgey nor Breitbarth ever discussed with Jouvenat a potential conflict of interest with SCPIE and its insureds. Forgey did not advise him
 
 *1037
 
 there were two medical theories regarding Ashley’s injuries: one which related to Jouvenat’s negligence in delivery, and the second which involved aggravation of the injuries caused by Hsu and Wu. Forgey also did not advise him that an expert had been designated on his behalf (Dr. Martin) by Jouvenat’s prior attorney, McDonald, who could have helped Jouvenat on the issue of contribution “for the injuries versus Hsu and Wu.” He did recall that Forgey suggested a “united defense” with the other defendants and that they would “work all together to try to get this case resolved.” Later, Forgey advised him to admit liability in an attempt to avoid punitive damages because of his past history of drug and alcohol abuse. He reluctantly agreed to do so. He testified he had told Forgey about his financial situation at their original meeting but never gave Forgey consent to discuss this subject with SCPIE, assuming that what he told Forgey was privileged.
 

 Mosier’s medical experts, Drs. Menkes and Moosa, the same doctors who had testified in the personal injury action on behalf of Ashley, testified that had Hsu and Wu promptly and correctly diagnosed Ashley’s spinal cord injury, and Ashley been treated with steroids, as recommended by a leading pediatric textbook, Ashley would not be ventilator dependent. Dr. Perry Lubens, a pediatric neurologist who had also testified at Ashley’s trial, gave testimony consistent with his testimony in the prior case and on the same subjects: the difference between care necessary for a ventilator dependent quadriplegic and care necessary for a nonventilator dependent quadriplegic, and the standard of care in 1987 with regard to use of steroids in cases similar to Ashley’s.
 

 Mosier called Steven Prater, a professor and author of treatises on insurance law, former general counsel for an insurance company, expert witness, and lecturer. He generally explained what liability insurance was; explained the
 
 Cumis
 
 case; the legislative history of Civil Code section 2860; and defined the term “reservation of rights.” He discussed the concepts of good faith and fair dealing, defined the nature of a fiduciary relationship, the duties of retained counsel in relation to the insured versus the insurer, the need for full disclosure between retained counsel and the insured, and waiver by the insured of potential conflicts. He described the industry practice of hiring counsel to represent the insured from the same basic pool of attorneys, and discussed the concept of a “courtesy defense,” stating that, based on his knowledge of the industry and the legal research he had performed, it was an unusual arrangement. He also explained the reason for the principle established in the
 
 Cumis
 
 case and codified in section 2860: When a carrier provides a defense but asserts no duty to indemnify, a potential conflict of interest arises because of conflicting economic motives between the insured and the insurer.
 

 
 *1038
 
 Specifically with regard to the facts of this case, Prater agreed with SCPIE that it was not
 
 obligated
 
 to provide insurance coverage to Jouvenat, but concluded that the arrangement agreed to was a type of “insurance contract” between SCPIE and Jouvenat. He explained that within the insurance industry there are insurance contracts to pay only for legal fees which resemble standard contracts of insurance. According to Prater, the concept of good faith and fair dealing and a “fiduciary-like duty” was implied in the “contract” between Jouvenat and SCPIE, and therefore SCPIE had an obligation to “tell the truth and be up front with” Jouvenat about the arrangement, including potential conflicts of interest and the theories and issues pertaining to the defense of Hsu and Wu and of Jouvenat.
 

 Prater further testified that he had reviewed the correspondence between SCPIE and Forgey, and between Forgey and Jouvenat, as well as SCPIE’s internal files. He opined that the situation presented a conflict of interest which would be well known in the insurance industry. He explained that while there was nothing wrong with SCPIE providing an attorney to Jouvenat, communications between SCPIE and Forgey should have been limited to billing matters. He did not think that a letter from SCPIE (Breitbarth) to Jouvenat (exhibit 53) offering to pay for Forgey’s fees, fully and fairly described the truth of what was being contemplated by SCPIE, nor did it fully disclose to Jouvenat Forgey’s past relationship with SCPIE and why SCPIE chose Forgey. He explained that the situation implied that Forgey would be a team player who would help “shift the responsibility away from the insureds [Hsu and Wu] whom they had a duty to indemnify.” In particular, he was asked to look at that portion of the document titled “Plan B” which indicated that SCPIE was giving a courtesy defense to Jouvenat “enabling us to maintain control” of the litigation. He opined that, under the facts presented, this violated the duty owed by the carrier under the principles encompassed within
 
 Cumis
 
 and Civil Code section 2860.
 

 Erwin Chemerinsky was also called on behalf of Hosier and testified that he is a law professor and lecturer and one of his areas of expertise is professional responsibility and ethics. He advised the jury that an attorney retained by a carrier to represent the insured must give first fidelity to the insured even though the insurance company is paying the bill. He defined the concept of “appearance of impropriety” for the jury. He generally opined that while there was nothing wrong with SCPIE’s agreement to pay Forgey, or discussions between Forgey and SCPIE relating to payment of fees, communications between Forgey and SCPIE on other matters, especially settlement, may give rise to potential conflicts, although he was not asked to identify any such conflicts here. He was asked about Forgey’s duties to communicate an offer to assign Jouvenat’s rights against SCPIE after the
 
 *1039
 
 judgment had been entered to Ashley, and he indicated that as long as Forgey had authorization from Jouvenat he could discuss the offer with SCPEE.
 

 The Verdict
 

 The jury returned a special verdict which reflected the following findings: (1) SCPEE made a representation as to a material fact to Jouvenat in obtaining his consent to accept Darrell Forgey as his attorney for the Ashley Hughes trial; (2) the representation was false; (3) the agents of SCPIE knew that the representation was false when it was made; (4) the agents of SCPEE made the representation with the intent to defraud Jouvenat; (5) Jouvenat was not aware of the falsity of the representation made by any of the agents of SCPÍE when he accepted Forgey as his attorney; (6) Jouvenat acted in reliance upon the truth of the representation; (7) Jouvenat was justified in relying on the representation; (8) Jouvenat acted to his detriment in relying upon the representation; (9) SCPIE participated in a conspiracy to breach the fiduciary duty owed by Forgey to Jouvenat by its actions in connection with providing Forgey as an attorney; (10) Jouvenat, Hsu and Wu were all negligent; (11) the negligence of each of them was a legal cause or aggravation of injury to Ashley; (12) the percentage of negligence attributable to Jouvenat was 40 percent, and the percentage attributable to Hsu and Wu was 60 percent; and (13) there was clear and convincing evidence that SCPEE’s conduct constituted oppression, malice and fraud.
 

 Counsel had agreed that the total amount of Ashley’s damages, which had been determined in the personal injury trial, need not be recomputed and that the dollar amount of the judgment would be calculated based upon the new percentages of liability attributed to each of the doctors. The final amount of compensatory damages, $4,221,078,909, was reached by stipulation of counsel by subtracting the difference between the two allocation percentages multiplied against the damages in the first trial.
 

 The punitive damage phase took place the following day. The jury returned with a special verdict indicating that punitive damages in the amount of $65 million should be assessed against SCPIE. This amount was reduced by the trial court to $14 million following a new trial motion by SCPIE, and the judgment was entered.
 

 Discussion
 

 1.
 
 Standing of Trustee
 

 SCPIE asserts that Mosier, a bankruptcy trustee, had no standing to pursue this action.
 

 
 *1040
 
 Section 704 of the Bankruptcy Code requires the trustee to “collect and reduce to money the property of the estate for which such trustee serves.” (11 U.S.C. § 704.) Section 541 of the Bankruptcy Code defines property of the estate as “all legal or equitable interests of the debtor in property as of the commencement of the case.” (11 U.S.C. § 541.) This includes “all claims that could reasonably be regarded as having roots in the prebankruptcy past. [Citations.]”
 
 (Purdy
 
 v.
 
 Pacific Automobile Ins. Co.
 
 (1984) 157 Cal.App.3d 59, 72 [203 Cal.Rptr. 524].) Because Jouvenat’s claim for fraud and conspiracy to breach fiduciary duty against SCPIE arose before his petition was filed, Mosier properly prosecuted this action on his behalf. (See also
 
 Shearson Lehman Hutton, Inc.
 
 v.
 
 Wagoner
 
 (2d Cir. 1991) 944 F.2d 114, 118; and
 
 In re Ryerson
 
 (9th Cir. 1984) 739 F.2d 1423, 1425.)
 

 We agree with the proposition of law argued by appellant that a trustee may not assert claims limited to a specific group of creditors.
 
 (Shearson Lehman Hutton, Inc.
 
 v.
 
 Wagoner, supra,
 
 944 F.2d at p. 188;
 
 E.F. Hutton & Co.
 
 v.
 
 Hadley
 
 (11th Cir. 1990) 901 F.2d 979, 985.) Here, however, the claims asserted by Mosier are not specific or limited to Ashley; they are claims of damage to Jouvenat, the debtor.
 
 (In re Martin
 
 (Bankr. C.D.I11. 1993) 162 B.R. 710, 717.) The fact that moneys claimed may ultimately inure to Ashley’s benefit is of no moment, since all priority claimants to the estate of Jouvenat must be paid off first and the unsecured creditors of Jouvenat’s estate would then share ratably with Ashley. (11 U.S.C. §§ 506, 507, 726(a) and (b).)
 

 2.
 
 Duty and the Relationship Between SCPIE and Jouvenat
 

 The evidence is uncontroverted that Jouvenat was not insured by SCPIE for the underlying personal injury action and SCPIE owed him no defense. Thus, prior to offering Dr. Jouvenat the courtesy defense, the only duty SCPIE owed with regard to that action was to its insureds, Hsu and Wu, to conduct itself in good faith for their benefit.
 
 (State Farm Fire & Casualty
 
 v.
 
 Superior Court
 
 (1989) 216 Cal.App.3d 1222, 1226 [265 Cal.Rptr. 372].)
 

 We conclude that SCPIE’s voluntary action of providing a defense to Jouvenat created a relationship giving rise to a duty on behalf of SCPIE towards Jouvenat based on the principle that one who voluntarily comes to the aid of another, having no initial duty to do so, becomes bound to exercise due care in the performance of the duties it undertakes to provide. Under the same principle, the volunteer may become liable when harm is suffered by the victim in reliance upon the undertaking of the volunteer.
 
 (Williams
 
 v.
 
 State of California
 
 (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137];
 
 Hechnann
 
 v.
 
 Ahmanson
 
 (1985) 168 Cal.App.3d 119, 132 [214 Cal.Rptr. 177].)
 

 
 *1041
 
 We believe the relationship here is analogous to the conflict situation which can arise from the tripartite relationship recognized in
 
 San Diego Federal Credit Union
 
 v.
 
 Cumis Ins. Society, Inc., supra,
 
 162 Cal.App.3d 358 0Cumis) and its progeny. In
 
 Cumis,
 
 the problem presented was loyalty of counsel retained by an insurance carrier to defend an insured after the carrier issued a reservation of rights contesting the duty to indemnify. The court explained the conflict as follows: “In the usual tripartite relationship existing between insurer, insured and counsel, there is a single, common interest shared among them. Dual representation by counsel is beneficial since the shared goal of minimizing or eliminating liability to a third party is the same. A different situation is presented, however, when some or all of the allegations in the complaint do not fall within the scope of coverage under the policy. In such a case, the standard practice of an insurer is to defend under a reservation of rights where the insurer promises to defend but states it may not indemnify the insured if liability is found. In this situation, there may be little commonality of interest. Opposing poles of interest are represented on the one hand in the insurer’s desire to establish in the third party suit the insured’s ‘liability rested on intentional conduct’ [citation], and thus no coverage under the policy, and on the other hand in the insured’s desire to ‘obtain a ruling . . . such liability emanated from the nonintentional conduct within his insurance coverage’ [citation]. Although issues of coverage ... are not actually litigated in the third party suit, this does not detract from the force of these opposing interests as they operate on the attorney selected by the insurer, who has a dual agency status [citation].”
 
 (Cumis, supra,
 
 162 Cal.App.3d at pp. 364-365, fns. omitted.)
 

 The reason this situation is analogous to that mentioned in
 
 Cumis
 
 is that while SCPIE was providing a defense to Jouvenat, it insisted that it would not indemnify him; that duty only reached to SCPIE’s insureds, Hsu and Wu. While a joint defense may have been beneficial to a certain point, as urged by SCPIE and conceded by respondent, it does not require much sophistication to understand the conflict which existed: SCPIE was in a position to mold the outcome of the underlying litigation to benefit its own financial interests by diminishing the liability of its insureds at the expense of Jouvenat.
 

 While the similarity of the conflict is significant, the reason the analogy to
 
 Cumis
 
 is so compelling is because
 
 Cumis
 
 is based on ethical standards, not on insurance concepts.
 
 (Golden Eagle Ins. Co.
 
 v.
 
 Foremost Ins. Co.
 
 (1993) 20 Cal.App.4th 1372, 1394-1395 [25 Cal.Rptr.2d 242];
 
 Blanchard
 
 v.
 
 State Farm Fire & Casualty Co.
 
 (1991) 2 Cal.App.4th 345, 350 [2 Cal.Rptr.2d 884].) In that regard, after reviewing the American Bar Association’s Code of Ethical Consideration, the court in
 
 Cumis
 
 concluded: “[T]he
 
 *1042
 
 Canons of Ethics impose upon lawyers hired by the insurer an obligation to explain to the insured and the insurer the full implications of joint representation in situations where the insurer has reserved its rights to deny coverage. If the insured does not give an informed consent to continued representation, counsel must cease to represent both. Moreover, in 'the absence of such consent, where there are divergent interests of the insured and the insurer brought about by the insurer’s reservation of rights based on possible noncoverage under the insurance policy, the insurer must pay the reasonable cost for hiring independent counsel by the insured. The insurer may not compel the insured to surrender control of the litigation [citations]. Disregarding the common interests of both insured and insurer in finding total nonliability in the third party action, the remaining interests of the two diverge to such an extent as to create an actual, ethical conflict of interest warranting payment for the insureds’ independent counsel.”
 
 (Cumis, supra,
 
 162 Cal.App.3d at p. 375.)
 
 [10]
 

 In 1987, the Legislature enacted Civil Code section 2860, codifying the principles enunciated in
 
 Cumis.
 
 That section specifically sets forth procedures to be followed for determining when a right to independent counsel exists, how to select such counsel, how to pay counsel and how to waive the right of independent counsel, and how information is to be exchanged between independent counsel and counsel for the insured. Civil Code section 2860, subdivision (f) provides in part that independent counsel has an “ethical and legal obligation to the insured.”
 

 “This view is echoed in the case law. Our high court has noted that ‘[t]he purpose of requiring
 
 Cumis
 
 counsel is to protect an
 
 insured’s
 
 interest.’ (J.C.
 
 Penney Casualty Ins. Co.
 
 v.
 
 M.K.
 
 (1991) 52 Cal.3d 1009, 1018 [278 Cal.Rptr. 64, 804 P.2d 689], italics in original.) Another court has noted that ‘[t]he
 
 Cumis
 
 rule requires
 
 complete independence of counsel
 
 when an insurance company interposes a reservation of rights, the basis of which creates a conflict of interest.’
 
 (State Farm Fire & Casualty Co.
 
 v.
 
 Superior Court
 
 [,
 
 supra,]
 
 216 Cal.App.3d [at p.] 1226, italics added.) This view has been most forcefully stated in
 
 [.Employers Ins. of Wausau
 
 v.
 
 Albert D. Seeno Const.
 
 (N.D.Cal. 1988) 692 F.Supp. 1150]: ‘Cumis counsel represents] solely the insured . . . .’ (692 F.Supp. at p. 1157.)”
 
 (Assurance Co. of America
 
 v.
 
 Haven
 
 (1995) 32 Cal.App.4th 78, 87 [38 Cal.Rptr.2d 25].)
 

 Cumis
 
 counsel’s obligations to the insurance carrier are limited to disclosing, informing, consulting and cooperating with the carrier regarding unprivileged information. (Civ. Code, § 2860, subds. (d) and (f).) “These
 
 *1043
 
 obligations are strictly of an informational character, and arise only because of the unique three-cornered arrangement that carriers create when they agree to defend only under a reservation of rights. [Citation.] Most significantly, these clearly are
 
 not
 
 the obligations of a lawyer to a client. [Citation.] They could not be—because one lawyer cannot simultaneously represent two parties between whose interests there is such an obvious and significant on-going tension. [Citations.]”
 
 (First Pacific Networks, Ins.
 
 v.
 
 Atlantic Mut. Ins. Co.
 
 (N.D.Cal. 1995) 163 F.R.D. 574, 579.)
 

 While this situation is not identical to the situation addressed by
 
 Cumis
 
 and Civil Code section 2860, we adopt that framework for the application of duty in this case. We conclude that once SCPIE offered to defend Jouvenat, and Jouvenat accepted the offer, SCPIE owed the same duties to defend Jouvenat as it would have had Jouvenat in fact been its insured.
 

 3.
 
 Sufficiency of Evidence
 

 The matter was submitted to the jury on two legal theories, fraud and conspiracy to breach fiduciary duty. Here we discuss the evidence in regard to each of those theories except for damages and causation, which we discuss in the next section. However, before we turn to the two causes of action we must address SCPIE’s argument about sufficiency of the evidence to establish Forgey’s malpractice.
 

 a.
 
 Malpractice
 

 SCPIE argues that Forgey’s representation of Jouvenat fell within the standard of care in the community and that no malpractice was shown, which it asserts is a prerequisite to maintaining this action.
 
 [11]
 

 We agree that no malpractice in the classical sense is exhibited here, i.e., negligence in recognition and application of legal principles involved in
 
 *1044
 
 defense of the underlying litigation. Rather, the theory of this case was breach of fiduciary duty, a concept which is separate and distinct from traditional professional negligence but which still comprises legal malpractice.
 
 (Buehler
 
 v.
 
 Sbardellati
 
 (1995) 34 Cal.App.4th 1527, 1544, fn. 9 [41 Cal.Rptr.2d 104];
 
 Stanley
 
 v.
 
 Richmond
 
 (1995) 35 Cal.App.4th 1070, 1086 [41 Cal.Rptr.2d 768].)
 

 The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach.
 
 (Stanley
 
 v.
 
 Richmond,
 
 supra, 35 Cal.App.4th at p. 1086.)
 

 The scope of the duty owed to a client is based upon the California Rules of Professional Conduct. (35 Cal.App.4th at p. 1086.) In particular, the version of rule 3-310 in effect in 1991 provided that: “(B) A member shall not concurrently represent clients whose interests conflict, except with their informed written consent. [¶] . . . [¶] (E) A member shall not accept compensation for representing a client from one other than the client unless: [¶] (1)
 
 There is no interference with the member’s independence of professional judgment or with the client-lawyer
 
 relationship; and [¶] . . . [¶] (3)
 
 The client consents after disclosure .
 
 . . ,”
 
 [12]
 
 (Italics added.)
 

 At trial, Jouvenat testified Forgey never explained to him the nature, scope, and duties relating to the representation or of the potential conflict which existed between him and Hsu and Wu and between him and SCPIE. Forgey testified he believed that no conflict existed, that the concepts expressed in
 
 Cumis
 
 were not applicable, and that he never sought to obtain from Jouvenat a
 
 Cumis
 
 waiver. He also testified he kept in contact with SCPIE and passed information to it which was not passed on to Jouvenat. As we have previously discussed, the evidence establishes a conflict existed between Jouvenat and Hsu and Wu as well as between Jouvenat and SCPIE. The evidence is sufficient to support a conclusion that Forgey proceeded with the joint defense without a full and complete disclosure to Jouvenat and without obtaining his informed consent. Thus, the jury had sufficient evidence to conclude that Forgey breached his fiduciary duty to Jouvenat.
 

 b.
 
 Fraud
 

 SCPIE contends there was insufficient evidence to support the finding of fraud—specifically, that no misrepresentation was proven and justifiable reliance was not established.
 

 
 *1045
 
 The elements of a fraud cause of action are: “(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage. (BAJI No. 12.35 (7th ed. (1986).)”
 
 (Marketing West, Inc.
 
 v.
 
 Sanyo Fisher (USA) Corp.
 
 (1992) 6 Cal.App.4th 603, 612-613 [7 Cal.Rptr.2d 859].)
 

 Misrepresentation
 

 In the second section above, we concluded that SCPIE’s voluntary defense of Jouvenat established a duty akin to the duty owed by an insurer to the insured under
 
 Cumis,
 
 which would include the duty of full disclosure by SCPIE to Jouvenat regarding the nature and scope of the defense being offered to Jouvenat. The parties apparently appreciated this duty and agreed to the following jury instruction, which was given by the court:
 

 “Ordinarily, expressions of opinion are not treated as representations of fact upon which to base actionable fraud.
 

 “However, when one party possesses or holds himself out as possessing superior knowledge or special Information regarding the subject of a representation, and the other party is so situated that he may reasonably rely upon such supposed superior knowledge or special information, a representation made by the party possessing or holding himself out as possessing such knowledge or information will be treated as a representation of fact although if made by any other person it might be regarded as an expression of opinion.
 

 “When a party states an opinion as a fact, in such a manner that it is reasonable to rely and act upon it as a fact, it may be treated as a representation of fact.”
 

 Here, the gist of the action by Mosier was that SCPIE had agreed to provide a defense to Jouvenat with the secret intent to benefit SCPIE’s own financial interests at the expense of Jouvenat. At trial, Jouvenat testified Breitbarth called him and conveyed SCPIE’s offer to pay for Forgey to “try to help me keep the damages down for myself and defend me in trial.” In addition, SCPIE wrote to him the following day, stating that Forgey would be retained to “represent you” and to “assist you.” Jouvenat testified that
 

 
 *1046
 
 neither Forgey nor SCPIE’s representatives explained the nature, scope, and duties relating to the representation, or the potential conflict; that SCPIE’s financial interest and intent was to keep the liability of its
 
 insureds
 
 to a minimum; that Forgey’s duty was to protect Jouvenat’s interests alone; that Forgey had previously represented SCPIE in numerous legal matters; or the potential for conflict arising out of the joint defense suggested by Forgey.
 

 Assuming, as we must, that the jury believed Jouvenat’s testimony, this evidence is sufficient to support the finding by the jury that SCPIE made a misrepresentation to Jouvenat by giving him unreasonable assurances which were false in light of SCPIE’s secret intent.
 

 Reliance
 

 (7) “The rule in this state and elsewhere is that it is not necessary to show reliance upon false representations by direct evidence. ‘The fact of reliance upon alleged false representations may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect.’ [Citations.]”
 
 (Vasquez
 
 v.
 
 Superior Court
 
 (1971) 4 Cal.3d 800, 814 [94 Cal.Rptr. 796, 484 P.2d 964].)
 

 (3f) When Jouvenat was asked why he accepted SCPIE’s offer he testified as follows:
 

 “How—how can I compare this?
 

 “It’s—it was a—it was favorable on the basis that having had somebody with some legal experience to be there and formally make objections or formally help me with the defense was—was relished on the basis there was somebody who is a lot smarter than I am in a courtroom.
 

 “And if it was offered, take it. I felt it was an offer in good faith; and, however, I was angry about the fact that they came in so late on this situation. But it eased my situation insofar as trying to get a practice together where I was and concentrating on that part of my life. It certainly head
 
 [sic]
 
 that I could continue to work at the same time and still be in court.”
 

 There is no doubt that on the eve of trial, without funds to retain a lawyer to defend himself against a career-threatening event, without having designated any expert witnesses, and without having any legal training, Jouvenat was in a very vulnerable position. SCPIE took advantage of the situation by
 
 *1047
 
 throwing him a lifeline and offering him a defense to “try to help [him] keep the damages down for [himself] and defend [him] in trial.” Evidence of his reliance is the fact that he accepted the offer, and his testimony. It is reasonable to believe that just about any person in his position would conclude that he would do better with an attorney than he could do if he continued to represent himself. Moreover, Jouvenat had less reason to suspect something was wrong with the offer since he had formerly been insured by SCPIE. What is not demonstrated is that Jouvenat accepted the defense knowing or having reason to know that SCPIE was offering the defense primarily to benefit its own financial situation to the detriment of Jouvenat.
 

 We conclude that there is substantial evidence to support the finding of the jury with regard to reliance.
 

 The Jury Question on Misrepresentation
 

 In a related argument, SCPIE contends the court erred in responding to a juror’s question regarding misrepresentation. The question arose in connection with the first two questions on the special verdict form: (1) whether SCPIE made a misrepresentation of material fact to Jouvenat in obtaining his consent to accept Forgey as his attorney; and (2) if this representation was false. The following colloquy occurred: “Foreperson Reyes: [A juror] wants to know if question No. 2 is directly related to the material fact in question No. 1. [¶] The Court: Yes. [¶] Foreperson Reyes: And the material fact is the representation that they were going to provide an attorney free of charge? [¶] The Court: And his only allegiance would be to Dr. Jouvenat. [¶] Foreperson Reyes: And for his benefit alone? [¶] The Court: Yes.”
 

 SCPIE claims this answer was erroneous because it “instructed] the jury to find fraud if Forgey’s representation benefited other than Jouvenat. It is in the
 
 nature
 
 of a joint defense that
 
 all
 
 defendants will benefit on issues of common concern.”
 

 It is not reasonable to conclude that the response given by the court was understood by the jury as suggested by SCPIE. The import of the response was merely to advise the jury that Forgey’s primary allegiance was to represent the interests of Jouvenat, not SCPIE. The response was in accord with the law
 
 (Cumis, supra,
 
 162 Cal.App.3d 358 and Civ. Code, § 2860) and we find no error.
 

 c.
 
 Conspiracy to Breach Fiduciary Duty
 

 SCPIE contends that because it had no insurer-insured relationship with Jouvenat it cannot be liable for conspiring to breach a duty only Forgey owed to Jouvenat.
 

 
 *1048
 
 The elements of a civil conspiracy are “(1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting. [Citations.]”
 
 (Unruh
 
 v.
 
 Truck Insurance Exchange
 
 (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063];
 
 Doctors’ Co.
 
 v.
 
 Superior Court
 
 (1989) 49 Cal.3d 39, 44 [260 Cal.Rptr. 183, 775 P.2d 508].)
 

 We agree with SCPIE that the general rule is that a party who is not personally bound by the duty violated may not be held liable for civil conspiracy even though it may have participated in the agreement underlying the injury.
 
 (Applied Equipment Corp.
 
 v.
 
 Litton Saudi Arabia Ltd.
 
 (1994) 7 Cal.4th 503, 511 [28 Cal.Rptr.2d 475, 869 P.2d 454];
 
 Doctors’ Co.
 
 v.
 
 Superior Court, supra,
 
 49 Cal.3d at p. 44.) However, an exception to this rule exists when the participant acts in furtherance of its own financial gain.
 
 (Doctors’ Co.
 
 v.
 
 Superior Court, supra,
 
 49 Cal.3d at p. 47;
 
 Skarbrevik
 
 v.
 
 Cohen, England & Whitfield
 
 (1991) 231 Cal.App.3d 692, 709 [282 Cal.Rptr. 627].)
 

 In addition, as we have previously concluded, once SCPIE and Jouvenat agreed that SCPIE would provide a defense to Jouvenat, a formal relationship akin to that of insured and insurer was formed giving rise to the principles enunciated in
 
 Cumis, supra,
 
 162 Cal.App.3d 358. This serves as a sufficient independent foundation upon which to base liability for breach of fiduciary duties owed by Forgey to Jouvenat. (See
 
 Barney
 
 v.
 
 Aetna Casualty & Surety Co.
 
 (1986) 185 Cal.App.3d 966, 982 [230 Cal.Rptr. 215] [insurance company can be held liable for conspiring with the attorneys it hires to represent its insured].)
 

 Evidence established that SCPIE’s motivation for providing a defense to Jouvenat was to attempt to limit its exposure accruing through its insureds, Hsu and Wu. The plan to offer Jouvenat legal services was initiated between SCPIE and legal counsel retained by it to represent its insureds, and the plan was then implemented and facilitated through SCPIE by retaining counsel to represent Jouvenat. SCPIE continued to be involved in the defense strategy and was aware of Forgey’s every move. Without SCPIE, Forgey and Jouvenat would have never crossed paths. Based on its stake in the outcome and continued involvement in the plan, substantial evidence supports liability of SCPIE for conspiracy to breach a duty to Jouvenat.
 

 4.
 
 Causation/Damages
 

 For causation to be established, there must be a nexus between the compensatory damages assessed and the breaches of fiduciary duty.
 
 {Stanley
 
 
 *1049
 
 v.
 
 Richmond, supra,
 
 35 Cal.App.4th at p. 1086;
 
 DiPalma
 
 v.
 
 Seldman
 
 (1994) 27 Cal.App.4th 1499, 1506 [33 Cal.Rptr.2d 219];
 
 Jackson
 
 v.
 
 Johnson
 
 (1992) 5 Cal.App.4th 1350, 1355 [7 Cal.Rptr.2d 482].) In this instance the compensatory damages are a purely a mathematical result of measuring the difference between two quantities: subtraction of the result of multiplication of 40 percent times the damages assessed in the personal injury action from multiplication of 70 percent times the same damages. In other words, the jury was not asked to independently assess damages attributable to the fault of SCPIE and Forgey. Thus, we must analyze the evidence presented at the first trial with that from second trial to determine whether there is substantial evidence to support the difference in allocation of fault.
 
 [13]
 

 Respondent asserts three separate failures of Forgey which support liability: (1) Forgey abandoned Jouvenat’s defense that Hsu and Wu caused Ashley’s ventilator dependence; (2) Forgey failed to advise Jouvenat to assign his rights against SCPIE to Ashley in exchange for a satisfaction of judgment; and (3) Forgey failed to advocate Jouvenat’s claim to a credit for the entire Hospital settlement against Jouvenat’s portion of liability.
 

 Turning first to items 2 and 3, each of those alleged delicts occurred after the original verdict had been entered and could not have had any factual nexus to the allocation of fault by the first jury. Therefore, they are not relevant to the calculation of compensatory damages.
 
 [14]
 
 We turn now to the first item.
 

 The measure of damages in a case predicated on legal malpractice “is the difference between what was recovered and what would have been
 
 *1050
 
 recovered but for the attorney’s wrongful act or omission. [Citations.] [¶] Thus, in a legal malpractice action, if a reasonably competent attorney would have obtained a $3 million recovery for the client but the negligent attorney obtained only a $2 million recovery, the client’s damage due to the attorney’s negligence would be $1 million—the difference between what a competent attorney would have obtained and what the negligent attorney obtained.”
 
 (Norton
 
 v.
 
 Superior Court
 
 (1994) 24 Cal.App.4th 1750, 1758 [30 Cal.Rptr.2d 217];
 
 Mattco Forge, Inc.
 
 v.
 
 Arthur Young & Co.
 
 (1997) 52 Cal.App.4th 820, 834 [60 Cal.Rptr.2d 780] [trial-within-a-trial is the standard of proof to determine damages actually caused by a professional’s negligence];
 
 Travelers Ins. Co.
 
 v.
 
 Lesher, supra,
 
 187 Cal.App.3d at p. 197 [“ ‘An attorney malpractice action . . . involves a suit within a suit, a reconsideration of the previous legal claim, and only by determining whether or not the original claim was good can proximate damages be determined.’ [Citation.]”].)
 

 The parties correctly proceeded on the theory of trial within a trial and the jury reapportioned fault. However, we cannot accept the mere fact that the jury reapportioned fault as evidence of damage. It is not inconceivable that different juries viewing the same facts independently will reach differing conclusions on apportionment of fault. It is necessary that substantial evidence exist which legally supports the difference in apportionment. We therefore review the two trials and focus on the issue of apportionment.
 

 In the first trial, plaintiffs presented Drs. Menkes and Mooka, each of whom supported the theory that Hsu and Wu breached their duty of due care to Ashley by failing to diagnose the spinal cord lesion and thereafter by failing to administer steroids. Dr. Menkes testified that it was inore probable than not that treatment by steroids within hours after the injury would have improved Ashley’s chances for some type of recovery. Dr. Lubens also testified in the prior action on the subjects of the difference in care necessary to maintain a nonventilator dependent quadriplegic versus a ventilator dependent quadriplegic. Each of those doctors again testified in this case and gave the same basic evidence.
 

 Over the objection of SCPIE, the trial court allowed Dr. Menkes to introduce new evidence on the issue of causation in the form of studies which became available only after the prior trial. The significance of this new evidence is demonstrated in the following exchange between Pagel and Dr. Menkes:
 
 *1051
 
 statistically significant improvement in the function of the—of the affected muscle-and this is statistically to a 95 percent probability.
 

 
 *1050
 
 “A. [By Dr. Menkes] We now know that if infants, not anyone, with a spinal cord injury is treated prior to eight hours after the injury, there is a
 

 
 *1051
 
 “Q. [By Fagel] Now, at the time of your testimony in trial in June of 1991, what was the degree of probability of your opinion that had Dr. Hsu and Wu treated Ashley in the first four to eight hours after her delivery, she would have had significant improvement in terms of her ability to breathe on her own and use her arms for a motorized wheelchair?
 

 “A. It was more likely than not, so it was 51 percent.
 

 “Q. So what is that opinion today?
 

 “A. It’s 95 percent.”
 

 SCPIE contends that Forgey cannot be faulted for not introducing evidence that did not exist when he tried the case. We agree and conclude that the trial court erred in allowing the evidence. The evidence itself demonstrates its potential prejudicial effect. While Dr. Menkes did not change his testimony regarding causation from the original trial, the certainty of his opinion increased from 51 percent to 95 percent that the acts of Hsu and Wu damaged Ashley. This change in conviction of certainty could well explain the reallocation by the second jury. Except for these new studies, there appears to be no new or different evidence of medical causation to explain the difference in allocation.
 
 [15]
 

 Next, we focus on the fault attributed to Forgey by respondent in connection with the trial. Respondent argues that Forgey failed to advise Jouvenat that Dr. Martin was available to testify on his behalf and Forgey failed to obtain Jouvenat’s fully informed consent to present a joint defense and forego an attempt to obtain a more favorable allocation of fault against Hsu and Wu.
 

 Initially, we must note that Jouvenat did not testify that had he been fully informed by Forgey he would have insisted upon a different defense strategy. Second, while Forgey may not have advised Jouvenat that Dr. Martin was available to testify, Dr. Martin was not called to testify in this trial and
 
 *1052
 
 we cannot speculate on what effect his testimony may have had if he had been called.
 

 Finally, the most important aspect of the underlying trial is that Jouvenat did agree to admit liability, for which respondent does not assign fault to Forgey. This resulted in plaintiffs being able to focus all of their effort and the jury’s attention solely upon the fault of Hsu and Wu in the first trial. In that regard, the memorandum of Susan Robins to Forgey pointed out that the motivation of the plaintiffs in the personal injury action was to visit as much liability upon Hsu and Wu as possible because they were the only remaining defendants with insurance or assets. Not only were plaintiffs successful in this endeavor, they were able to establish that Hsu and Wu were liable for intentionally covering up their negligence and that of Jouvenat. There is no evidence in this record to establish that had Forgey joined in the attack by plaintiffs, the allocation of fault by the original jury would have been any different. None of the so-called experts called by respondent even expressed an opinion on the subject and it would be pure speculation for us to so conclude.
 

 We agree that there is evidence in the record which does support a different allocation, but it is not attributable to the fault of Forgey or SCPIE in connection with trial of the personal injury action. We have already commented on the new studies which were not available for use in the prior trial. The most devastating evidence, however, was that of Jouvenat’s resulting bankruptcy, which occurred after the verdict in the first trial. Armed with this knowledge, the jury could easily have concluded that if they did not reallocate fault, the victim, Ashley, would not receive the benefit of the underlying judgment against Jouvenat.
 
 [16]
 

 The evidence is uncontradicted that Jouvenat was uninsured for the claim and was considering filing bankruptcy before he was approached by SCPIE
 
 *1053
 
 and offered the courtesy defense. He had already spoken with a bankruptcy lawyer and he advised Forgey of this option at their first meeting. There is no suggestion in the record that had the original verdict come in at an allocation of 40 percent for Jouvenat, instead of 70 percent, that he would not have filed bankruptcy. The resulting judgment would have been in excess of $4 million against assets of $32,083. Based on the same reasoning, in light of his bankruptcy discharge, we cannot conclude that the difference in allocation actually harmed Jouvenat.
 

 At oral argument respondent cited
 
 Purdy
 
 v.
 
 Pacific Automobile Ins. Co., supra,
 
 157 Cal.App.3d 59, for the proposition that an insurance carrier cannot force an insured into bankruptcy and then urge that its actions caused no harm. We agree with
 
 Purdy
 
 and the concept for which it was cited. However, it is not applicable to the facts presented here. In
 
 Purdy
 
 the insured was covered for indemnity and the carrier refused a settlement demand within policy limits. The resulting judgment against Purdy was in excess of the policy limits and caused him to file for bankruptcy. The lesson of
 
 Purdy
 
 is that if the carrier had not breached its duty and had accepted the policy limits demand, Purdy would not have had to file for bankruptcy. In addition to the resulting excess judgment, Purdy also proved that he had resulting personal damages from the carrier’s breach of its duty. No such damages were proven here.
 

 While we sympathize with the tragic circumstances which gave rise to the original suit, and the fact that Ashley will be precluded from recovering any additional damages, the unfairness is not a result of the breaches of duty by Forgey and SCPIE, but the fact that Jouvenat was not insured to begin with and was forced to elect bankruptcy after rendition of the underlying judgment.
 

 We conclude that there is no substantial evidence to support reallocation of fault other than the desire of the second jury to remedy a perceived unfairness generated by Jouvenat’s bankruptcy.
 

 
 *1054
 
 Disposition
 

 The judgment is reversed. The parties are to absorb their own costs.
 

 Vogel (C. S.), P. J., and Epstein, J., concurred.
 

 A petition for a rehearing was denied May 29, 1998.
 

 [1]
 

 Forgey and his law firm were also named as defendants but settled for $70,000 prior to trial. However, as a condition to settlement of SCPIE’s cross-complaint, they remained as nominal parties during trial of the case.
 

 [2]
 

 Ashley’s family claimed they asked the neonatologists to check her neck, knowing the delivery had been difficult. Kong-Tay Wu stated that he told Hsu and Wu that Ashley’s spinal cord might be injured. Hsu and Wu denied that Kong-Tay Wu ever discussed the possibility of a spinal cord injury with them and denied that the family ever asked about Ashley’s neck, and never identified the injury.
 

 [3]
 

 In April 1988, Jouvenat quit practicing medicine and voluntarily entered a substance abuse treatment center at the Hospital. He successfully completed the course and began practicing again in September of that year.
 

 [4]
 

 At the close of evidence, SCPIE’s motion for a directed verdict was granted to the causes of action for breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing. No cross-appeal was noticed.
 

 [5]
 

 On appeal, respondents do not contend that Forgey breached any duty when he advised and obtained Jouvenat’s consent to admit liability.
 

 [6]
 

 In January 1991, his title was changed to assistant vice-president of claims.
 

 [7]
 

 Forgey testified that at the time he was approached on this case he was the managing partner of his firm, and it was his responsibility to interface with the various insurance companies who were clients of the firm. Forty percent of the firm’s work was medical malpractice, and SCPIE was one of his firm’s major clients.
 

 [8]
 

 The term
 
 Cumis
 
 refers to the case of
 
 San Diego Federal Credit Union
 
 v.
 
 Cumis Ins. Society, Inc.
 
 (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913], which we discuss later in this opinion. The gist of the opinion is that where an. insurer is providing a defense to an insured and a conflict of interest exists by reason of a reservation of rights to deny indemnity, then the insured has the right to independent counsel at the expense of the insurer.
 

 [9]
 

 Forgey testified that Robins had previously been an attorney with Marshall Silberberg’s firm and in that capacity had attended the deposition sessions of Jouvenat, prior to the time Forgey’s firm was involved. She had since come to work for Hillsinger and Costanzo.
 

 [10]
 

 This is undoubtedly the portion of
 
 Cumis
 
 which Bruce Bolger had in mind when he wrote the memorandum citing
 
 Cumis
 
 to Forgey on March 29, 1991.
 

 [11]
 

 SCPIE relies on
 
 Travelers Ins. Co.
 
 v.
 
 Lesher
 
 (1986) 187 Cal.App.3d 169 [231 Cal.Rptr. 791] (disapproved on another point in
 
 Buss
 
 v.
 
 Superior Court
 
 (1997) 16 Cal.4th 35, 50 [65 Cal.Rptr.2d 366, 939 P.2d 766]) to support this argument. SCPIE misreads
 
 Travelers. Travelers
 
 does not suggest that malpractice is a necessary element of Mosier’s fraud claim. It merely stands for the proposition that damages must be established by virtue of a trial within a trial, exactly what occurred here. We also note that none of the cases cited by SCPIE require that malpractice be established as an additional element to be proven in a fraud case against an insurer. They merely note that fraud and malpractice claims against attorneys are analogous in limited respects. A fraud claim against an attorney is not necessarily a malpractice claim. (See
 
 Pollack
 
 v.
 
 Lytle
 
 (1981) 120 Cal.App.3d 931, 944 [175 Cal.Rptr. 81] [complaint did not state facts sufficient to support cause of action for legal malpractice, but did state a cause of action for fraud];
 
 Purdy
 
 v.
 
 Pacific Automobile Ins. Co., supra,
 
 157 Cal.App.3d 59 [malpractice cause of action against insurance company’s attorneys insufficient, but causes of
 
 *1044
 
 action for bad faith refusal to settle and emotional distress against same parties allowed to stand].)
 

 [12]
 

 Rules of Professional Conduct, rule 3-310 was amended August 13, 1992.
 

 [13]
 

 For purposes of causation there is no distinction between the two legal theories of fraud and conspiracy to breach fiduciary duty. The causation in both instances is dependent upon the nature of the defense provided to Jouvenat by Forgey.
 

 [14]
 

 The evidence is undisputed that Forgey did convey to Jouvenat the offer of Fagel to take an assignment against SCPIE in satisfaction of the judgment. What is asserted on appeal is that Forgey did not sufficiently
 
 pressure
 
 Jouvenat into accepting the offer. We cannot agree with the premise that it is a breach of fiduciary duty if an attorney fails to pressure a client into acting. We also disagree with respondent that Forgey breached a fiduciary duty or was guilty of malpractice by not opposing the motion of Hsu and Wu for offset of the prior settlements. The motion requested that the entire judgment be offset with the prior settlements, which would have resulted in a pro rata credit to Jouvenat, not an inappropriate request. Respondent cites no authority to us for the proposition that Jouvenat had a right to 100 percent of the offset. In any event, the issue became moot because Fagel reached a settlement with Hsu and Wu before the court ruled on the motion. Ultimately, the court calculated the final judgment against Jouvenat by crediting Jouvenat’s portion with a pro rata portion of the prior settlements and holding him responsible for only 70 percent of the remaining damages, a correct result pursuant to Proposition 51. (Civ. Code, § 1431 et seq.)
 

 [16]
 

 This was apparently the subject of discussion by the jurors during the trial and deliberations. SCPIE filed a motion for new trial asserting, among other arguments, that the jury was guilty of misconduct, and it filed two declarations in support of the motion. On this subject, the declaration of Dennis M., the lone dissenting juror on many of the verdict questions, indicated that Martineau P. said to him during the trial, “We got to give the kid some money.” He also claimed that during a discussion as to who would ultimately be the beneficiary of the money, “Everyone, with the exception of myself, stated to the effect that they wanted Ashley Hughes to get some money.” He did not indicate when this discussion took place. He then elaborated that in addition to Martineau P.’s previous statement, Eleanor R. had made this comment during the first or second day of deliberations, and that Gloria S., Izetta H. and Edward R. made similar comments but did not specify when those comments were made. He stated that during the punitive damages phase, the discussion of who would ultimately get the money became more extensive. Dennis M., who wanted to award $178 million, told the other
 

 [15]
 

 Respondent points out that of the total yearly cost for the maintenance of Ashley’s ventilator is just over 60 percent, a figure close to the allocation found by the second jury. While this could explain the allocation, the first jury had access to the same information.
 
 *1053
 
 jurors to keep the figure low so that SCPIE would actually pay the amount awarded. Martineau P. said again, “Well we gotta get this girl some money. Somebody has got to pay the judgment.” In opposition to this evidence, Mosier submitted the declarations of Jurors Eleanor R. and Martineau P. Eleanor R., the foreperson, stated that Dennis M. was the person who stated, “We have got to get the girl some money.” Martineau P. stated that it was Dennis M. who tried to convince the others that any award would go to Mr. Fagel or Dr. Jouvenat, but not to Ashley. His declaration did not address whether he had made the statements attributed to him by Dennis M. about giving “the kid some money.”