Filed 3/30/16  Soleimani v. Seyfarth Shaw LLP CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| MAHSHID SOLEIMANI, | B260808 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC497252) |
| v. | |
| SEYFARTH SHAW LLP, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Yvette M. Palazuelos, Judge.  Affirmed.

Mahshid Soleimani, in pro. per., for Plaintiff and Appellant.

Waxler, Carner, Brodsky, Andrew J. Waxler and Brian D. Peters for Defendant and Respondent.

_____

Plaintiff Mahshid Soleimani brought a legal malpractice action against defendant Seyfarth Shaw LLP (Seyfarth), asserting two causes of action:  legal malpractice; and breach of fiduciary duty.  Seyfarth successfully demurred to the breach of fiduciary duty cause of action and obtained summary judgment on the legal malpractice.  Soleimani appeals.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Soleimani's suit is based on Seyfarth's limited representation of her in connection with some postjudgment proceedings in her marital dissolution action from her husband Tourage (husband).  Although Seyfarth obtained summary judgment based largely on Soleimani's procedural defaults, a review of the facts of Seyfarth's representation in the underlying action demonstrates that Soleimani's malpractice action had no legitimate factual basis.

1.    *The Underlying Action*

    A.    *The Judgment of Dissolution*

A judgment of dissolution, based on a settlement agreement, was entered between Soleimani and husband on July 30, 2009.  Soleimani and husband owned several properties, and held these properties through different legal entities.  The judgment allocated the properties, and the entities, between Soleimani and husband as their separate property.  There was one piece of property, referred to as the Modesto property, which the divorcing spouses agreed to put in a trust for the benefit of their children.  Pursuant to the judgment, Soleimani and husband were to share the costs of establishing the Modesto property trust.

    B.    *"Wild Deeds" are Recorded*

In January 2010, husband recorded several deeds, pertaining to three properties which were allocated to Soleimani in the divorce settlement.  The deeds had been prepared by husband's counsel to convey the properties to Soleimani.  Although the deeds indicated that both husband and Soleimani were the transferors, they were signed only by husband.  There is a second problem with the deeds:  the properties in question had not been held by Soleimani and husband directly, but by entities controlled by

2

Soleimani and husband; thus, the transferors in the deeds should have been the entities, not the individuals. Husband's counsel was aware the recorded deeds were inadequate to convey the properties to Soleimani. New deeds were prepared, which required Soleimani's signature.

### C.    Husband's Motion to Enforce Judgment

In August 2010, husband filed a motion to enforce the judgment. Soleimani had refused to sign the deeds that would replace the wild deeds and convey the properties to her; she had similarly refused to sign deeds that would convey other properties to husband—all pursuant to the judgment of dissolution. Husband filed a motion for an order directing the clerk to sign all of the documents on Soleimani's behalf.

### D.    Seyfarth is Retained

At the time, Soleimani was represented in the dissolution action by Attorney Brian Kramer. Kramer thought it necessary to retain an expert in trust and tax matters to look over the documents husband had wanted Soleimani to sign, and advise her regarding the legal and tax effects of executing the documents. On Kramer's recommendation, Seyfarth was retained to do so. On October 5, 2010, Soleimani and Seyfarth executed an engagement letter setting forth the limited representation. Thereafter, a notice of limited scope representation was filed in the dissolution action. The two attorneys at Seyfarth working Soleimani's case were Patricia Chock and Alan Yoshitake.

### E.    The November 1, 2010 Hearing

While Soleimani's family law attorney, Kramer, prepared Soleimani's opposition to husband's motion to enforce the judgment, Yoshitake submitted a supporting declaration addressing the tax and property issues. At the November 1, 2010 hearing, Kramer argued other issues on behalf of Soleimani, while Chock argued the transactional issues.

Two issues that Chock argued are relevant for our purposes: the Modesto property and the disposition of a corporation known as JBJ Real Estate Management, Inc. (JBJ).

There was no dispute that the parties had intended to create a trust to hold the Modesto property for their children. But husband's attorney had conceded that there

3

might be unintended gift tax issues that would arise by the creation of the trust. The trial court indicated that it would not order Soleimani to sign something that caused a tax consequence neither party had intended. There was a second issue regarding the Modesto property. It was then held by an entity known as Yosemite, and Yosemite itself was not allocated between Soleimani and husband in the judgment of dissolution. At this point in the hearing, husband's counsel represented that Yosemite was not part of husband's motion, and that this was something the parties had to discuss.

JBJ was the general partner for some of the limited partnerships owned by Soleimani and husband, including Yosemite (which held the Modesto property). The documents prepared by husband, which he wanted Soleimani to sign (or have the court sign on her behalf) would have transferred JBJ to her. At the time of the hearing, JBJ was not in good standing according to the Secretary of State, and it was unclear if JBJ had filed tax returns for 2009. Soleimani was concerned about taking sole ownership of JBJ under these circumstances. The court told Attorney Chock to "assume that I'm going to make them clear the taxes and put the corporation back in good standing," and asked if there were any other reasons why Soleimani should not be ordered to sign the documents once JBJ was reinstated. Attorney Chock replied the JBJ was not allocated to either spouse in the judgment of dissolution. Husband's counsel acknowledged that JBJ was not allocated in the judgment, and the court concluded that it had no jurisdiction to force Soleimani to sign a document regarding an asset that was not addressed in the judgment. As JBJ was a missed asset, the court concluded that it could do nothing with JBJ, but the parties could resolve the issue themselves.

As the hearing progressed, the court stated its intent to grant husband's motion. But first, the court directed the parties to meet and confer, based on the court's comments. The court indicated that either Soleimani would sign the documents or the court would order the clerk to sign them for her that afternoon.

*F.     The November 1, 2010 Stipulation*

Soleimani, husband, and their counsel then met and conferred, reaching a stipulation that resolved all issues. The stipulation provided that husband's counsel

4

would hold all deeds and other assignment documents until December 1, 2010. In the meantime, the parties' accountants would meet and confer to resolve outstanding loans on the books between the various partnership entities. The stipulation also provided that husband would assume all interest in JBJ, except for JBJ's interest in Yosemite, which would be subject to the parties' meet and confer as to the disposition of Yosemite itself. As to partnerships allocated to Soleimani in which JBJ was the general partner, she was to amend those partnerships to name a new general partner that she controlled.

The parties returned to court and represented that they had resolved everything. Both Soleimani and her husband personally testified that they agreed to the stipulation and wanted it made a court order. The court signed it, and the stipulation and order were filed.

G.   *The November 19, 2010 Order*

On November 19, 2010, in apparent disregard of the November 1, 2010 stipulation and order, the trial court issued the order which husband's counsel had previously submitted in connection with its motion to enforce the judgment. The order incorporated none of the terms of the stipulation, nor any of the statements the court had made at the hearing. For example, the order indicated that the clerk should sign, on Soleimani's behalf, an assignment of corporate interest transferring JBJ to Soleimani—while the parties' stipulation gave JBJ to husband, and the court had previously indicated that because JBJ was not addressed in the judgment, it would make no order regarding JBJ at all. In January 2011, the clerk signed all of the deeds and assignments on behalf of Soleimani.

Seyfarth was unaware that the court had entered the November 19, 2010 order, or that the clerk had signed the documents, until February 2011.[1] In the meantime, Kramer

---

[1]   Soleimani takes the position that this is a disputed fact, and that it is possible that Seyfarth was aware of this order when it was entered, and simply hid the fact from her. At summary judgment, Seyfarth offered, as an undisputed fact, that it did not learn of the order until February 2011. The fact was supported by Chock's declaration to that effect. In opposition, Soleimani simply stated, "This is a disputed fact," but offered no evidence

sought, unsuccessfully, to have the parties' accountants meet and confer to resolve their differences pursuant to the stipulation.

### H. Soleimani's Relationship With Kramer Terminates

In March 2011, Kramer's relationship with Soleimani deteriorated to the point where he stopped representing her. Soleimani was then briefly represented by Attorney Malcolm McNeil, but ultimately represented herself in the dissolution. During this time, Seyfarth continued to advise Soleimani solely on trust, tax, and real estate issues.

### I. Ultimate Disposition of JBJ and the Modesto Property

In April 2011, while Soleimani was represented by Attorney McNeil, Soleimani signed an assignment of her interest in JBJ to husband. She did so on McNeil's advice, in McNeil's office. Soleimani would later testify at deposition that, when she signed the assignment, it was her understanding that McNeil would hold it, but he instead sent it to husband's counsel without her consent. Husband's counsel later represented to the court that she destroyed the assignment previously signed by the clerk transferring JBJ to Soleimani.

Husband thus had control of JBJ. JBJ had a 1 percent in Yosemite, and was its general partner. Soleimani and husband otherwise owned equal shares of Yosemite; with JBJ being transferred to husband, he now had control of it. In August 2012, husband would use his control of JBJ to have Yosemite deed the Modesto property to another entity he controlled. In other words, Soleimani's assignment of her interest in JBJ to husband enabled husband to take control of the Modesto property; this was in apparent violation of the dissolution agreement that called for the property to be in trust for the parties' children.

### J. Soleimani Attempts to Vacate The November 19, 2010 Order

In June 2011, Soleimani, acting in pro. per., filed an order to show cause in an attempt to invalidate the court's November 19, 2010 order, on the basis that the order was not reflective of the stipulation and order entered by the court at the November 1, 2010

---

beyond the entry of the order itself. As Seyfarth had evidence supporting its lack of knowledge, and Soleimani had none to the contrary, we treat the fact as established.

6

hearing.[2] The court denied Soleimani's motion, indicating that every order had been entered intentionally.

*K.      The End of Seyfarth's Attorney/Client Relationship*

Throughout 2011, Chock continued to advise Soleimani on trust deeds, tax, and real estate issues. Chock believed that progress was being made in negotiations with husband, but no agreements were reached.

In October 2011, Chock learned of the wild deeds that had been executed in January 2010 by husband only. When Chock learned of the wild deeds, she informed Soleimani, and advised her that those deeds were void.

Chock's communication with Soleimani regarding her discovery of the wild deeds was the beginning of the end of the attorney/client relationship. Soleimani lost faith in Seyfarth, and demanded to know how husband had recorded the wild deeds without her having signed them, and how Seyfarth had not known about the wild deeds earlier. She sent vitriolic e-mails to Chock and Yoshitake, accusing them of fraud and reflecting her hope that they would lose their licenses to practice. She speculated that Chock and Yoshitake had been in cahoots with husband to defraud her. Seyfarth's representation of Soleimani formally ended shortly thereafter.

*L.      No Trust on the Modesto Property*

As mentioned above, in 2012, after Seyfarth's representation of Soleimani ended, husband used his control of JBJ to have Yosemite transfer the Modesto property to another entity husband controlled.

Soleimani and husband had agreed, in the dissolution, that the Modesto property would be placed in trust for their children, and both spouses would share the costs of establishing the trust. In July 2011, while Seyfarth was still on the case, Soleimani wrote Seyfarth a check from a joint account for the purpose of setting up the trust on the

---

[2]      In the same document, Soleimani raised several other complaints. One month later, she filed a supplement to the motion, seeking court clarification of additional issues. The propriety of the family court's ruling on Soleimani's motion is not before us.

Modesto property. Husband stopped payment on the check. Thereafter, a consultant for husband inquired as to Seyfarth's charges for establishing the trust; Chock replied, but husband never agreed to Seyfarth being retained for these purposes. Seyfarth never drafted the trust documents.

2.     *The Malpractice Action*

With the facts of the underlying action in mind, we now turn to the case before us, Soleimani's malpractice action against Seyfarth.

  A.     *The Complaint*

On December 17, 2012, Soleimani, represented by counsel, filed a complaint against Seyfarth alleging causes of action for legal malpractice and breach of fiduciary duty. The complaint itemizes four ways in which Seyfarth was alleged to have failed to act with reasonable care: (a) failure to properly "consider, investigate, research and/or advise" Soleimani as to her rights to the entities and property being divided in her divorce; (b) failure to discover and inform her of inaccuracies in the property transfer documents it was retained to review; (c) failure to propose changes or work with opposing counsel to make changes to the transfer documents husband's counsel had prepared; and (d) failure to discover, inform or advise Soleimani that tax returns and other documents provided to them showed inconsistencies as to Soleimani's ownership interest in the assets to be divided between the parties to the divorce.[3]

As to breach of fiduciary duty, the complaint alleges the same errors, and suggests that Seyfarth did these things for its own self-interest in the fees it would generate by remaining on the case.

---

[3]     This fourth basis is not pursued on appeal. While the complaint is somewhat uncertain, it appears to allege that at least one property owned by Soleimani and husband may have been incorrectly reported as an asset of a partnership in which a third individual held a 25 percent interest. Soleimani alleged Seyfarth should have discovered this earlier.

8

*B.     Seyfarth Demurs to the Breach of Fiduciary Duty Cause of Action*

Seyfarth demurred to the breach of fiduciary duty cause of action only.  Seyfarth argued that no cause of action for breach of fiduciary duty was stated; Soleimani had simply realleged legal malpractice.  Soleimani, who was now in pro. per., opposed the demurrer with a lengthy factual discussion of Seyfarth's alleged acts of malfeasance, but provided no citation to authority, and no argument as to how those acts amounted to a breach of fiduciary duty rather than simple malpractice.[4]

The trial court sustained the demurrer without leave to amend.  Having reviewed the allegations of the complaint, the court concluded that the allegations of breach of fiduciary duty were merely duplicative of the allegations of legal malpractice.  Plaintiff's motion for reconsideration, which only reargued her opposition to the demurrer, was denied.

*C.     Soleimani Incurs Discovery Sanctions*

Seyfarth answered the complaint and discovery commenced.  In May 2014, the trial court granted Seyfarth's motion to compel further discovery responses.  The record contains only the trial court's order.  The order states that Seyfarth had moved to compel further responses to special interrogatories, requests for production, and form interrogatories.  While the court upheld a few of Soleimani's objections to particular document requests, Soleimani was ordered to provide further responses to each of the three discovery requests at issue.  Seyfarth had sought sanctions of $3,485 in connection with the special interrogatories, $1,310 in connection with the requests for production, and $1,060 in connection with the form interrogatories.  The court awarded a total of $3,500 in sanctions for all three motions.

*D.     Seyfarth Moves for Summary Judgment*

On June 20, 2014, Seyfarth moved for summary judgment on the remaining legal malpractice cause of action.  Seyfarth's motion was based on two theories:  (1) that

---

[4]     Soleimani's only argument was that the "sheer number" of negligent acts "indicates deception."

Seyfarth's representation complied with the standard of care at all times; and (2) even if it did not, there was no evidence that but for Seyfarth's negligence, Soleimani would have obtained a more favorable result. The motion was supported by declarations of Chock and Yoshitake, and numerous exhibits reflecting the course of Seyfarth's representation. Additionally, Seyfarth submitted the declaration of Attorney Timothy D. McGonigle, an expert on attorney malpractice. McGonigle stated his opinion that Seyfarth "used the skill and care that a similarly situated, reasonably careful and qualified attorney practicing in Southern California would have used under similar circumstances and therefore complied with the applicable standard of care." McGonigle did not stop at that generalization, but explained in detail how he believed Seyfarth complied with the standard of care at every step of its representation.

### E.     Soleimani's Opposition

Soleimani opposed the motion for summary judgment with a single argumentative document to which she attached numerous unauthenticated exhibits. She did not submit a declaration of her own under penalty of perjury. She did not submit a separate statement in response to Seyfarth's separate statement of undisputed facts. She simply identified (by number) 22 of Seyfarth's undisputed facts with which she took issue, and collectively argued against them.

Soleimani did attempt to submit the declaration of her own expert on the standard of care, Attorney Connolly Oyler. The declaration was not submitted under penalty of perjury. Instead, the words "Respectfully submitted" appeared above his signature.[5] On the merits, Oyler's declaration includes a "discussion" section which sets forth certain concerns about Seyfarth's representation of Soleimani—such as that certain concerns of her requests of Seyfarth were repeatedly ignored. However, the only acts which Oyler specifically asserts were negligent are: (1) Seyfarth's failure to order a title search on the properties and entities when it was first retained; and (2) Seyfarth's advice to Soleimani

---

[5]     His signature itself appears under his firm's name, and over the words, "Attorneys' for Plaintiff"—although it is clear that Oyler was a retained expert, not counsel for Soleimani.

on November 1, 2010, to grant JBJ to husband "without recognizing that by doing so [Soleimani] unintentionally made her ex-husband the controlling partner of all of the [limited partnerships] under the authority of JBJ as their general partner." On the issue of causation, Oyler states only that had Seyfarth "ordered appropriate title reports, which was their duty to do so, issues could have been raised and, hopefully, resolved."

Seyfarth filed evidentiary objections to nearly all of Soleimani's evidence, and the Oyler declaration. While Seyfarth raised individual objections to nearly every paragraph of the Oyler declaration, it also objected to the declaration in its entirety, on the basis that it was not executed under penalty of perjury as required by Code of Civil Procedure section 2015.5. On the day before the hearing on the summary judgment motion, after Seyfarth had already filed its reply, Soleimani filed an amended declaration of Oyler. The amended declaration was identical to the original declaration, except it now stated, both at the start and above the signature line, that it was "under penalty of perjury." Seyfarth immediately objected to the amended declaration as untimely and still not in strict compliance with Code of Civil Procedure section 2015.5 (by failing to identify the place of execution, or indicating that it was subject to the California laws of perjury).

At the hearing on the motion, the trial court indicated an intention to continue the hearing to enable Soleimani to file a separate statement. Soleimani then asked the court for permission to file a declaration on her own behalf. Seyfarth agreed that the court had discretion to do so, but argued against exercising its discretion in that manner. The court declined Soleimani's request, permitting her to file only a separate statement.

Soleimani then filed a separate statement which failed to comply with Code of Civil Procedure section 437c, subdivision (b)(3). It failed to indicate whether Soleimani agreed or disagreed that each fact raised by Seyfarth was, in fact, undisputed. When Soleimani indicated disagreement with Seyfarth's facts, the disagreement was largely argumentative, and only rarely cited to evidence supporting her disagreement.

*F.    The Court Grants Summary Judgment*

After a hearing, the court granted the motion for summary judgment. It sustained all of Seyfarth's objections to Soleimani's evidence including the Oyler declaration. The

11

court concluded that Soleimani's failure to furnish an appropriate separate statement was fatal to her opposition—not in and of itself, but because Soleimani failed to demonstrate a triable issue of material fact, supported by admissible evidence, that Seyfarth was the but-for cause of any of her damages.

### G.    Judgment and Appeal

Because Soleimani's breach of fiduciary duty cause of action was resolved on demurrer, and her malpractice cause of action was resolved on summary judgment, the court entered judgment in favor of Seyfarth.

Soleimani filed a notice of appeal, indicating that she was appealing: (1) the judgment after summary judgment; (2) the dismissal after demurrer; and (3) the monetary discovery sanction.

## DISCUSSION

On appeal, Soleimani presents a scattershot argument, suggesting that the facts show Seyfarth was derelict in its representation, but with minimal argument as to how that supposed malpractice caused her damages, and no argument that the allegations of her complaint sufficiently supported a cause of action for breach of fiduciary duty. Contentions supported by neither argument nor citation of authority are deemed to be without foundation and abandoned.[6] (*Huntington Landmark Adult Community Assn. v. Ross* (1989) 213 Cal.App.3d 1012, 1021.) Moreover, several of her arguments are made for the first time in her reply brief; we need not consider them.[7] (*Reichardt v. Hoffman*

---

[6]    Soleimani also includes a somewhat incomprehensible argument under the heading, "COURT'S NO APPEARANCES ORDER AGAINST SOLEIMANI IS IN 'NO LEGAL FILE' FORM." The argument appears to be addressing an omission from the court's official docket sheet. Regardless of the merits of this argument, Soleimani has not indicated any way in which this would impact the judgment against her.

[7]    In implicit acknowledgement of her failure to file a declaration in opposition to the summary judgment motion, Soleimani requests that we consider her reply brief as a declaration under oath. While a reviewing court may, on motion, take new evidence on appeal (Cal. Rules of Court, rule 8.252(b)), that rule is not available when there is no good cause shown for the unavailability of the evidence in the trial court. (*DeYoung v.*

12

(1997) 52 Cal.App.4th 754, 764.)  Despite Soleimani's multiple procedural defaults, we will address both the propriety of the trial court's rulings and Soliemani's arguments on their merits.

1.      *The Summary Judgment Motion was Properly Granted*

"The standard of review for an order granting or denying a motion for summary judgment or adjudication is de novo.  [Citation.]  The trial court's stated reasons for granting summary relief are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale.  [Citation.]  [¶]  A party moving for summary judgment 'bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.'  [Citation.]  'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.'  [Citation.]  'A defendant bears the burden of persuasion that "one or more elements of" the "cause of action" in question "cannot be established," or that "there is a complete defense" thereto.  [Citation.]'  [Citation.]"  (*Moua v. Pittullo, Howington, Barker, Abernathy, LLP* (2014) 228 Cal.App.4th 107, 112 (*Moua*).)

"Generally, 'the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . .  A prima facie showing is one that is sufficient to support the position of the party in question.  [Citation.]' [Citation.]"  (*Moua, supra*, 228 Cal.App.4th at p. 112.)

Seyfarth obtained summary judgment of its legal malpractice cause of action.  The elements of such a cause of action are:  the duty of the attorney to use such skill, prudence, and diligence as attorneys commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and

---

*Del Mar Thoroughbred Club* (1984) 159 Cal.App.3d 858, 863, fn. 3.)  Soleimani has made no such showing, and we decline to take new evidence.

13

(4) actual loss or damage resulting from the attorney's negligence. (*Moua, supra*, 228 Cal.App.4th at p. 112.) If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. (*Id*. at pp. 112-113.) To establish causation, the plaintiff must prove that but for the attorney's negligent acts or omissions, he or she would have obtained a more favorable result. (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1582) In a legal malpractice case, the absence of causation may be decided on summary judgment if, on undisputed facts, there is no room for a reasonable difference of opinion. (*Id*. at p. 1583.)

Seyfarth moved for summary judgment on two elements, standard of care and causation of damages. Seyfarth met its burden as movant. On the issue of its compliance with the standard of care, Seyfarth offered expert testimony that it acted within the standard of care at all times. That shifted the burden to Soleimani to establish a triable issue of material fact that Seyfarth did not live up to the standard of care. Seyfarth also established that Soleimani could not establish she suffered damages as a result of Seyfarth's alleged wrongdoing. This shifted the burden to Soleimani to establish a triable issue of material fact that Seyfarth's alleged malpractice caused her harm.

As Soleimani's opposition was unsupported by admissible evidence of any kind, she failed to meet her burden.[8] Summary judgment was therefore properly granted.

Even if we were to consider the improperly sworn declaration of Soleimani's expert, Oyler, the result is the same. Oyler stated that Seyfarth failed to meet the standard of care in two ways: (1) by failing to obtain title reports when first retained; and (2) by advising Soleimani to grant JBJ to husband without recognizing that, by doing so,

---

[8]     On appeal, Soleimani states it "is not clear as to why" the trial court declined her request to file a sworn declaration at the same time it continued the summary judgment hearing to allow her to file a separate statement. To the extent she is arguing that the court abused its discretion in denying her permission to supplement her evidence, we conclude there was no abuse. Seyfarth had already replied to Soleimani's opposition, and Soleimani had no legitimate reason for not submitting a declaration when she first opposed the motion.

14

she unintentionally made husband the controlling partner in all of the partnerships in which JBJ was the general partner. As to the first, even if the failure to obtain title reports fell below the standard of care, Soleimani has identified no evidence establishing how she was damaged by this failure. Oyler himself provided only the pure speculation that, had title reports been obtained, "issues could have been raised and, hopefully, resolved." That is insufficient to defeat summary judgment. As to the second, advising Soleimani regarding JBJ is nowhere mentioned in Soleimani's complaint, and therefore cannot be a basis for defeating summary judgment.[9]

On appeal, Soleimani argues the evidence—admissible and inadmissible— establishes other acts of negligence of Seyfarth. But Soleimani does not provide even a plausible argument that any of these purported negligent acts caused her harm. For example, Soleimani argues that Seyfarth should have drafted the trust for the Modesto property (even though Soleimani and husband were to share the costs of the trust, and husband had never authorized Seyfarth to draft it). But even if Seyfarth had drafted a Modesto trust, it is wholly speculative that husband would have signed it. Soleimani states that, had the trust been drafted, she would have given it to her sons to present to husband for signature. Yet there is no evidence Soleimani's sons would have chosen to ask their father to sign the trust, nor that husband would have signed it had they asked.

---

[9] In any event, Oyler is simply factually mistaken, as the November 1, 2010 stipulation establishes. When Soleimani entered into that stipulation, with Chock's advice, the stipulation protected Soleimani against husband gaining control of other partnerships via his control of JBJ. The stipulation provided that, when husband assumed the interest in JBJ, he would *not* assume JBJ's interest in Yosemite and the parties would instead meet and confer regarding Yosemite. As to partnerships under Soleimani's control, she had 45 days in which to amend the ownership of those partnerships so they would have a general partner other than JBJ. In other words, the stipulation was keenly aware of JBJ's interests in both Yosemite and partnerships controlled by Soleimani, and made provisions to prevent husband from gaining control of those partnerships through his control of JBJ. That Soleimani subsequently signed JBJ over to husband without making certain the protections of the stipulation had been put into place is not something chargeable against Seyfarth; Soleimani testified that she signed the assignment on the advice of subsequent counsel, McNeil, and had not intended McNeil to transmit the assignment to husband's counsel at that time.

Thus, it is pure speculation that the result would have been any different had Seyfarth drafted a trust for the Modesto property. Similarly, Soleimani charges Seyfarth with negligence for failing to discover the wild deeds earlier, but makes no argument that the wild deeds themselves, or the delay in their discovery, had any adverse effect on her.

2.  *The Demurrer to the Breach of Fiduciary Duty Cause of Action was Properly Sustained*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

"The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach." (*Mosier v. Southern Cal. Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022, 1044.) In a cause of action by a client against its former attorney, the "scope of the duty owed to a client is based upon the California Rules of Professional Conduct." (*Ibid.*)

In setting forth the specific acts by which Seyfarth allegedly breached its fiduciary duties, Soleimani's complaint alleges that Seyfarth breach the duties of loyalty, fair dealing, and putting its client's interest ahead of its own by "failing to properly research and investigate the facts and circumstances relating to the ownership of certain real property and business interests" of Soleimani. But this is simply the language of

16

negligence. The trial court did not err in concluding Soleimani had not alleged breach of fiduciary duty.

On appeal, Soleimani makes no legal argument that she properly alleged breach of fiduciary duty. Instead she argues only that the allegation of breach of fiduciary duty was in her complaint "to determine whether Seyfarth . . . had . . . knowledge of" the entry of the November 19, 2010 order of the court "and had intentionally kept it from" her. At no point in her complaint did Soleimani allege that Seyfarth knew of this order and hid it from her. This therefore provided no basis for overruling the demurrer.[10]

Soleimani also argues that, because a demurrer admits the truth of the pleadings, Seyfarth's demurrer could not have been sustained unless and until Seyfarth had actually admitted the facts she had pleaded. Soleimani misunderstands the nature of a demurrer. Courts simply treat the demurrer as admitting (for the purposes of demurrer only) the truth of the facts alleged, in order to determine whether the complaint sufficiently states a cause of action.

3.    *Discovery Sanctions were Appropriately Granted*

Soleimani argues that the court erred in ordering her to pay Seyfarth $3500 in discovery sanctions.

Soleimani first argues that the court should not have sanctioned her at all, because she had answered the discovery requests to the best of her ability. But Soleimani did not provide a sufficient record on appeal to enable us to evaluate her answers and objections; the record does not include Seyfarth's motion to compel. It is the appellant's burden to provide an adequate record on appeal. To the extent the record is inadequate, we make all reasonable inferences in favor of the judgment. (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712.) We therefore infer that sanctions were warranted.

---

**10**    As both causes of action were properly resolved in Seyfarth's favor, we need not address Soleimani's argument on appeal that the court erred in granting Seyfarth's motion to strike Soleimani's allegations of punitive damages.

Soleimani next argues the court erred in sanctioning her $3500 when Seyfarth had sought sanctions of only $3,485.  Yet the court's order indicates that Seyfarth had sought sanctions in connection with three separate failures of discovery:  $3,485 in connection with the first, $1,310 in connection with the second, and $1,060 in connection with the third.  The court did not award more sanctions than sought; it awarded less.

## DISPOSITION

The judgment is affirmed.  Soleimani is to pay Seyfarth's costs on appeal.


RUBIN, ACTING P. J.

WE CONCUR:



FLIER, J.



GRIMES, J.

18